### KIPP *v.* EAST RIVER ELECTRIC LIGHT CO.

(*Common Pleas of New York City and County, General Term.* June 6, 1892.)

PRINCIPAL AND AGENT—AUTHORITY—EVIDENCE.

> An action to recover an undertaker's bill from a corporation for the funeral of an alleged employe, ordered by its general superintendent, must be supported by evidence of the superintendent's authority, and that deceased died in the service and on the premises of the corporation.

Appeal from fourth district court.

Action by Herman H. Kipp against the East River Electric Light Company to recover an undertaker's bill. Judgment for plaintiff. Defendant appeals. Reversed.

Argued before BOOKSTAVER and BISCHOFF, JJ.

*William H. Kelly,* for appellant.    *Peter Cook,* for respondent.

BOOKSTAVER, J. This action was brought for an undertaker's bill for the expenses of the funeral of one Tucker, ordered by E. E. Dexter, the alleged general superintendent of the defendant. The complaint alleges that Tucker was one of the employes of the defendant. This is put in issue by the answer, and, as far as appears by the return, there was no direct evidence given upon the trial as to whether or not Tucker was an employe of the defendant at the time of his death; nor does the return show that he died while in the service of the defendant, or upon its premises. Nor does it show anything in regard to the duties of Dexter as general superintendent, or to what extent he was authorized to represent the defendant in any business. Nor was there any evidence to show that the defendant, through its proper officers, directed or empowered Dexter to contract the expenses in question. Under such a state of facts, we cannot infer that Dexter, merely because he was the general superintendent of the defendant, was authorized to contract for the burial of an employe of the defendant, where it was not shown that the death occurred in the actual performance of duty, and on its premises. It owed no other or greater duty to an employe, under such circumstances, than does any other employer, and certainly it is not the duty of employers to pay the funeral expenses of an employe not dying on their premises. Besides, the defendant was incorporated for the purpose of the manufacture and sale and leasing of appliances for electric lighting, and the transmission of electricity for the production of heat, light, and power; and to contract for funeral expenses where there was no legal liability to pay may be *ultra vires. Jemison* v. *Bank,* 44 Hun, 412, 414, 416; Brice's Ultra Vires, pp. 28, 29; *Dartmouth College* v. *Woodward,* 4 Wheat. 518 *et seq.* See, also, *Schurr* v. *Investment*

*Co.*, (Com. Pl. N. Y.) 18 N. Y. Supp. 454, (decided in this court,) and authorities there cited, where. it was held that the contract there in controversy was entirely beyond the scope of defendant's business and powers, and therefore void.   Also, *Davis* v. *Railroad Co.*, 131 Mass. 258; *Relfe* v. *Rundle*, 103 U. S. 222; *Alexander* v. *Cauldwell*, 83 N. Y. 480.   The principle that, though the contract be *ultra vires*, yet, having been performed by the plaintiff, it is not open to defendant to resist its enforcement by one who has expended his labor on the faith of its validity, does not apply to this action.   *Schurr* v. *Investment Co.*, *supra.*   Those decisions which hold that a defendant corporation is estopped from questioning the validity of a contract made by it applies only when the contract has been executed for the benefit of the corporation, and that is not the case in this instance.   The judgment should therefore be reversed, and a new trial ordered, with costs to abide the event.   And this course is taken in this instance because, upon the argument before us, various facts were stated which do not appear by the return, and which may be proved upon such new trial.   For instance, if the plaintiff died upon defendant's premises, then at common law it would be bound to bury him.   *Reg.* v. *Stewart*, 12 Adol. & E. 773, where Lord DENMAN, in delivering the opinion of the court, said: "It should seem that the individual under whose roof a poor person dies is bound to carry the body, decently covered, to the place of burial.   He cannot keep him unburied, nor do anything which prevents Christian burial.   He cannot, therefore, cast him out, so as to expose the body to violation, or to offend the feelings of, or injure the health of, the living; and for the same reason he cannot carry him uncovered to the grave."   4 Perry & D. 349.   See, also, *Rappelyea* v. *Russell*, 1 Daly, 214; *Pierce* v. *Swan Point Cemetery*, 10 R. I. 227; *Rex* v. *Coleridge*, 2 Barn. & Ald. 806; *Chapple* v. *Cooper*, 13 Mees. & W. 252.   On the argument it was claimed that Tucker died while in the performance of his duties, upon one of the poles owned by the defendant, or used by it.   Obviously the dictates of our common humanity require that one dying under such circumstances should be removed from the public gaze as soon as possible, and that his body should be disposed of by a Christian burial; and, if the law imposes this duty on one under whose roof a dead body lies, much more would it impose that duty, under the circumstances stated, upon one owning the pole or having control of it.

It was also claimed that the bill was too large, considering the circumstances in life of the person buried.   It is the general right of every one, recognized as such by the common law, to have his body carried, decently covered, from the place where it lies to a proper place of burial.   See authorities before cited. But it needs the citation of no authority.   It is now, and throughout all ages has been, the common dictate of humanity to pay proper respect to the bodies of the dead.   This feeling is not peculiar to Christians, but has been the common feeling of humanity through all time, and of peoples of every religion. The patriarchs, when sojourners in the land, purchased burial places for their dead.   The body of Jacob was carried up from Egypt with great pomp to be buried with his fathers.   The burial of Patroclus, as recited in the Iliad, is but a single instance of the respect which the Greeks paid to their dead, and is equaled by the loving care of Priam, who went into the enemy's camp at night, guided by a god, to ransom the dead body of Hector from Achilles, in order to perform for it the customary funeral rites of the Trojans.   No more touching or tragic scene is portrayed in all literature than where Sophocles makes the slave wife, Tecmessa, and the infant son, of Ajax, the two weakest of mortals, protect the dead body of him who had been in life the most powerful of warriors from insult and dishonor at the hands of Agamemnon, the mightiest of the Greeks.   If the plaintiff on the new trial is able to establish such facts as would make the defendant liable at all, it would be liable for such an amount as would have secured proper and decent burial.   But for the reasons before given the judgment should be reversed, and a new trial ordered, with costs to the appellant to abide the event.