Ohio and Mississippi Railway Company *v.* Early, Administratrix.

———————◆———————

No. 16,271.

THE OHIO AND MISSISSIPPI RAILWAY COMPANY *v.* EARLY, ADMINISTRATRIX.

RAILROAD.—*Injured Employe.*—*Medical and Surgical Assistance.*—*Insufficiency of Evidence.*—*Verdict.*—That the evidence is not sufficient to support the verdict in an action seeking to recover damages on the ground of negligence of the railway company in failing to furnish medical and surgical assistance to one of its employes receiving a dangerous injury while engaged in the line of his duty as such servant, see opinion.

SAME.—*Injured Employe.*—*Duty to Furnish Medical and Surgical Aid.*—*Right of Employe to Select Time, Place and by Whom He will be Treated.*—*When Railroad Company's Duty Ceases.*—The duty of the railway company to furnish medical and surgical assistance to injured employes does not clothe the master with the power to dictate to the injured servant what particular physician or surgeon shall treat him; nor does it deprive such injured servant of the right of making a conscious and deliberate choice while in the possession of his mental faculties, of the time, place, and person by whom he will be treated. And if the master promptly places before such injured servant ample medical and surgical assistance, ready to meet the emergency, which he declines, then such emergency has ceased, and the duty with it. And if the choice thus made by the servant in the conscious exercise of his own free will results in a mistake, the company is not liable, because the duty ceased with the expiration of the emergency.

From the Jackson Circuit Court.

*E. Barton, H. D. McMullen, W. R. Johnson* and *H. R. McMullen,* for appellant.

*W. K. Marshall, J. A. Zaring, M. B. Hottell, B. K. Elliott* and *W. F. Elliott,* for appellee.

Ohio and Mississippi Railway Company *v.* Early, Administratrix.

McCABE, C. J.—This was a suit by the appellee against the appellant to recover damages for alleged negligence in the appellant causing the death of her intestate, Emmet Early.

A trial of the issues formed upon the complaint resulted in a verdict and judgment against appellant, over its motion for a new trial, for $5,000.

The important and controlling question in the case is whether the evidence is sufficient to support the verdict.

It appears that on the 5th day of December, 1887, the decedent was in the employment and service of appellant, in the capacity of a brakeman on one of appellant's freight trains running eastward through the county of Jennings, on appellant's railroad, and while in said employment and service, and in the line of his duty, he was required to couple a part of said freight train to a car standing on a side track of said railroad at Butlerville, in said county of Jennings, loaded with heavy logs, so that the ends projected over and beyond the end of said car, so as to make it necessary for said decedent to stoop down in order to make said coupling, and to get to the place of making said coupling said decedent had to run along by the side of the moving part of said train as it approached said car, and in stooping down to get to said coupling apparatus he was tripped and fell, and the wheels of the moving car ran over him and broke the bones of his leg and lacerated the flesh, muscles and veins of his leg so that the blood flowed from said wound in large quantities; that said wounds and flow of blood therefrom was in such quantity that it created a sudden emergency that required the immediate attention and service of a physician and surgeon to treat and dress said wounds and stop said flow of blood; that there were two physicians and surgeons, competent and skillful,

residing at, and practicing their profession at, said town of Butlerville.

The uncontroverted evidence shows that the car wheel passed over the decedent's leg below the knee, mashing it and breaking the bones and so mangling it that amputation, had he lived, would have been necessary. The employes of the appellant in charge of the train consisted of a conductor, engineer, fireman, and two brakemen, and the decedent, Early, being one of them, the conductor being the highest in authority of any employe or agent present on that occasion. The fireman was among the first to reach decedent after his injury; the other brakeman and several citizens of Butlerville came at once to lend assistance, and with his leg bleeding all the time he was carried to a shop in the vicinity and placed upon a lounge therein. The conductor being at the caboose, some distance from the place of the accident, a boy who saw it ran to him and told him of it, and as the two were running back the conductor inquired for a surgeon. By this time Early had been picked up and carried to the shop. The conductor asked some of the boys two or three times to run and get a physician, quick, as they were entering the shop with the wounded man. Dr. Nelson, one of the physicians resident in Butlerville, arrived and went into the shop with the crowd. A boy had gone for him, and as soon as he got into the shop the conductor inquired whether he was a surgeon. Dr. Nelson took temporary charge of the case, but he had no surgical instruments. Dr. Kendrick, the only other surgeon in Butlerville, arrived very soon. Up to this time the only employe of the appellant, other than the freight train crew mentioned, that had knowledge of the accident, was the local station agent. Butlerville was not a telegraph station, the nearest telegraph office being Nebraska, four miles east. The

train and crew remained about twenty minutes or half an hour after the accident, and being obliged to get their train out of the way of a west bound passenger train, due in a short time, proceeded on east with their train. Early did not want them to leave him there, and begged them not to do so, but the conductor told him they would have to go, and that at Nebraska they would telegraph some one for a doctor. Dr. Nelson had told the conductor that he had not the necessary instruments to perform an amputation, and that amputation would be necessary. The conductor told Dr. Nelson to take care of the patient as good as he could, and he turned and said to Early that he would go on with the train and would telegraph back and send a surgeon there to perform the operation. Early also requested that he should also send his wife, which the conductor promised to do. Dr. Nelson's understanding was that it was to be the appellant's surgeon from Seymour.

Another witness testified that the conductor said he would telegraph to Seymour for Dr. Gerrish. When the crew left, the wound had been bandaged by the doctor, and the flow of blood entirely checked. When the crew reached Nebraska the conductor thereof telegraphed to Seymour that Early had been injured, and to send him assistance at once. The dispatch was to the trainmaster, and the answer received was that the west bound passenger train No. 3, the first train that passed Butlerville after the accident, would stop there. It was due at Butlerville about forty minutes from the time the telegram was sent, but was not a train that regularly stopped there. Butlerville was twenty-three miles from Seymour, and seven miles from North Vernon, the distance from North Vernon to Seymour being fourteen miles. The running time from Butlerville to North Vernon was about ten minutes, and from North Vernon to Seymour

twenty-five minutes.   Dr. Gerrish lived at Seymour, as did also Early. In the answer to the freight conductor's telegram from Nebraska, nothing was said as to where Early would be taken.   A telegram was sent to his wife to come to him, and with this, and the telegram for assistance, the connection of the freight crew with the accident terminated.   The only employes of appellant having knowledge of the accident were the local agent and crew of the freight train.   At Osgood, a station east of Nebraska, the conductor of passenger train No. 3 received, through the telegraph, orders from the trainmaster to stop and get Early.

Although the fact is not directly stated, the inference is irresistible that the order directed that he be taken to North Vernon.

The conductor, whose evidence is just cited, is the only witness testifying as to the contents of the order, but subsequent events and inferences in other connections show that whatever the passenger conductor or others may have done or intended, the trainmaster did not order or intend that Early be taken to Seymour.

The passenger train reached Butlerville about an hour and a half after the accident, which had occurred between 8 and 9 o'clock in the evening.   It seemed to be understood there that Early would be taken away, for J. W. Gordon, a witness for plaintiff, testified as follows:

"Q. What was Dr. Nelson doing for him?   A. When I came in he was standing at the head of the lounge, and I asked the doctor if he could not do something for him. He said all that he could do was to keep him easy; that they were going to take him away in a little while, and he did something with the bandages on his leg."

That was after the freight crew had gone.   Dr. Nelson had gone to his office, leaving Dr. Kendrick with the patient, and, hearing the west bound passenger train

whistle to stop, he started back, and met one of the employes accompanying the passenger train, who asked him where the man was that had been hurt. The doctor told him, and the employe started to the place, but before he reached it met others carrying Early out.

J. L. McElroy, plaintiff's witness, who was in the shop where Early was lying, testified that neither the conductor nor any of the passenger train crew reached it, but that several fellows present picked up the lounge and carried Early out.

Willis Miles, another witness for plaintiff, also testified that the citizens there carried him out.

The passenger conductor inquired for Early with a view to taking him on the train; that he was brought out of the shop for that purpose and put in the baggage car on the cot or lounge on which he had been lying, with which there were some coverings; that the local station agent was present at the time; that Drs. Nelson and Kendrick were not consulted with as to the advisability of taking Early away, they both being present and walked along with him and others to the train and knew all about what was being done. Neither of them made any objection to his removal. It appears that he was in possession of perfect consciousness of what was being done with and for him, and that he gave an intelligent and conscious consent if he did not in fact actually request to be removed. There was no bleeding from his wound when first placed on the passenger train. The baggagemaster, who was with him on the car, testified, as a witness for the plaintiff, that "When they put him in the car they put him on the north side. I told them to move him on the other side, and that he was going to North Vernon. He said: "No, I want to go to Seymour." He was conscious all the way from Butlerville to North Vernon. The conductor stated that within two

or three minutes after they started from Butlerville he told Early he was going to take him to North Vernon, but that Early said he wanted to be taken to Seymour to his wife and Dr. Gerrish. He insisted on being taken to his home at Seymour, and expressed himself as though he was afraid of being left at North Vernon. He said he was afraid the doctors there would butcher him. All this occurred on the way from Butlerville to North Vernon. The run was made in about ten minutes, the train arriving at North Vernon two or three minutes late. While the train was stopped there his wound bled some; that within about fifty-two or fifty-three minutes from the dispatch from Nebraska to the trainmaster, Early was in North Vernon. Drs. Kyle and Light, two competent surgeons and physicians at North Vernon, came to the station there on the arrival of the train to render any services required. A room had been prepared there into which to take him, in anticipation that he would be taken off the train at North Vernon, and men were at the depot with a stretcher to carry him to the room. The train was detained there nearly an hour. Drs. Kyle and Light during that time administered to the wounded man some brandy. After the train had stood there a few minutes blood ran through the bed down on the floor, but not to amount to anything.

Dr. Kyle was the appellant's surgeon at North Vernon, and he called Dr. Light to assist in treating Early. The room mentioned had been procured in a hotel in response to a telegraphic dispatch by appellant's night watchman and baggagemaster at North Vernon, and he and the hotel proprietor were at the station to meet the train on its arrival ready with a folding cot to take Early off and to the room. He went into the car and saw the injured man. R. H. Swift, appellant's yardmaster at North Vernon, also went into the car and remained with

Early until he died. Early said ''he wanted Swift to stay with him and see him home; didn't want to be taken off at North Vernon, but wanted to be taken to Seymour to Dr. Gerrish.'' Swift told him he would do so. The run from North Vernon to Seymour was made in twenty-five minutes; and Early died at Dr. Gerrish's office in about an hour and a half after their arrival thereat. He bled some on the way, and lived about two hours and three-quarters after reaching Seymour. It was the opinion of the surgeons that the hemorrhage probably caused his death.

The complaint seeks to recover on the ground of negligence of the appellant in failing to furnish medical and surgical assistance to one of its employes receiving a dangerous injury while engaged in the line of his duty as such servant.

And the charge is that appellant negligently failed to furnish such aid at Butlerville, to stop the dangerous flow of blood, but wrongfully left him in the room in Butlerville, for a long space of time without such aid, and without any attempt to stop the dangerous flow of blood, and wrongfully placed him on a passing train, to be taken to Seymour, twenty-one miles distant, to Dr. Gerrish's office in said city. And that during the time the train was detained at North Vernon, there being competent physicians and surgeons residing there, who could and would have stopped the flow of blood from decedent's wounds, if called on to do so, but that appellant carelessly and negligently omitted and refused to procure their service, and as a direct result of such failure and neglect, when the office of Dr. Gerrish, at Seymour, was reached with Early, he was so far gone from loss of blood that nothing could be done to save his life, and that he died in twenty minutes after arriving at said office.

We do not think this evidence is sufficient to support the verdict.

While a railroad company is under no general legal obligation to furnish an employe who may receive injuries, while engaged in the service of the company, with medical or surgical assistance, yet where a day-laborer or employe has, by unforeseen accident to him, while engaged in the line of his duty as such employe, been rendered helpless, the dictates of humanity, duty, and fair dealing would seem to demand that it should furnish medical assistance.

Of course, this duty could not rest upon the master in ordinary cases, in the absence of a contract to do so, but should rest upon him only in extraordinary cases, where immediate medical or surgical assistance is imperatively required to save life or avoid further serious bodily injury. This duty on the railroad company only arises out of strict necessity and urgent exigency, where immediate attention thereto is demanded in order to save life or prevent great injury. The duty arises with the emergency and with it expires. *Terre Haute, etc., R. R. Co.* v. *McMurray,* 98 Ind. 358, and authorities there cited.

This duty does not clothe the master with the power to dictate to the injured servant what particular physician or surgeon shall treat him, nor does it deprive such injured servant of the right of making a conscious and deliberate choice while in the possession of his mental faculties, of the time, place, and person by whom, when and where he will be treated. And if the master, yielding to such right, complies with the request to be so treated, and at the same time promptly places before him ample medical and surgical assistance, ready to be rendered to meet the emergency, which he declines, then such emer-

gency has ceased, and the duty with it. And if the choice thus made in the conscious exercise of his own free will turns out to be a mistake, the company is not liable, because the duty ceased with the expiration of the emergency.

As to the conduct of the appellant's servants at Butlerville, assuming that the freight conductor was, in this emergency, clothed with the powers and charged with the duties of the appellant in that emergency, the uncontradicted evidence shows that he faithfully discharged those duties by promptly furnishing all the medical and surgical assistance to the injured servant within reach, or nearer than North Vernon, and that he promptly made arrangements that carried the decedent to North Vernon after his wound had been bandaged and the flow of blood stopped by such surgical aid as could be got at Butlerville. He reached North Vernon sooner than the surgeons there could have been brought to Butlerville after the accident, the distance being seven miles.

There is no shadow of evidence showing negligence at Butlerville on the appellant's part. The evidence shows, without contradiction, that the appellant had taken every precaution to have Early treated at North Vernon by proper medical and surgical skill, and that he declined it all except the brandy administered there by the physicians summoned in attendance by the appellant.

There was no necessity or emergency after that, and, therefore, no legal duty resting on appellant afterwards to furnish medical or surgical aid. The evidence shows, without any conflict, that the appellant met the pressing emergency and urgent necessity at Butlerville, and discharged the duty thereby imposed, and conceding, without deciding, that such emergency continued till the injured servant was brought to North Vernon, the duty

Pittsburgh, Cincinnati, Chicago and St. Louis Ry. Co. v. Sullivan.

imposed by such emergency was fully met there, and there, at least, it expired.

This is not a case of conflict or preponderance of the evidence, but one where the most favorable view that can be taken of it for the appellee shows that the verdict is not supported by proof of those indispensable facts without which, as we have indicated, there can be no liability on the part of the appellant.

The circuit court erred in overruling the appellant's motion for a new trial.

The judgment is reversed, and the cause remanded, with instructions to sustain the motion for a new trial.

Filed April 12, 1895.