## HOLMES *v.* McALLISTER.

1. MASTER AND SERVANT — ACCIDENT TO SERVANT — MEDICAL ATTENDANCE — LIABILITY OF MASTER.

    The rule of law recognized in reference to trainmen, and to persons employed in other lines of work which are attended by unusual risks, making the employer liable for the services of a physician summoned by the foreman to attend an injured employé in an emergency calling for immediate action, is not applicable to those lines of employment which do not subject the employé to unusual hazards and dangers.

2. SAME — OPERATING LAUNDRY — HAZARDS — PRESUMPTIONS.

    It cannot be presumed, in the absence of evidence, that employment in a laundry is attended by unusual hazards and dangers.

3. SAME—AGENCY—SCOPE OF AUTHORITY.

A foreman's implied authority to bind the employer for the services of a physician rendered to an injured employé does not extend to services rendered after the immediate emergency has passed, nor to the employment of additional physicians for assistance and consultation.

4. SAME—PROMISE TO PAY ANOTHER'S DEBT—STATUTE OF FRAUDS.

Where there was no original contract by an employer to pay for medical services rendered an injured employé, his subsequent verbal agreement to pay the bill already incurred is merely a promise to pay the debt of another, and is void under the statute of frauds.

Error to Wayne; Frazer, J. Submitted February 6, 1900. Decided March 27, 1900.

*Assumpsit* by Arthur D. Holmes against David J. McAllister and James A. McAllister, copartners as the Siau Laundering Company, for medical services rendered to an employé of defendants. From a judgment for plaintiff, defendants bring error. Reversed.

Plaintiff, a physician, sued the defendants, copartners in a laundry business, for medical services rendered one of their employés, and recovered a verdict of $50. The case was submitted to the jury upon two theories:

1. That there was an original contract of employment between plaintiff and defendants.

2. That the act of the forewoman of defendants in sending for plaintiff to attend the employé, if unauthorized by them, was subsequently ratified.

Defendants insist that there was no original contract, and no ratification of an unauthorized contract. There is little, if any, dispute about the material facts. Plaintiff had no conversation with either of the defendants in regard to the service, and the parties had never met until the trial in the justice's court. The employé, Augusta Senken, had her hand seriously injured on April 19, 1898. Neither of the defendants was in the laundry at the time. Defendant James usually spent most of his time there.

One Miss McGrath, the forewoman, had charge of the work on the four floors of the building; hired and discharged girls when she saw fit; and, when James was not there, acted in case of an emergency. The injury was so serious that Miss McGrath deemed prompt medical assistance advisable. She sent a boy for a physician, not designating any particular one. The boy called plaintiff. He immediately responded, dressed the wound, and ordered her to be taken home, saying that he would have to see her again. She was taken home in a carriage. In the afternoon of the same day she was suffering pain, and sent a note to a store near by to telephone to the laundry. Some one at the laundry telephoned to plaintiff, and he went to see her. Defendants had no knowledge of this. Plaintiff treated her at her home until she was able to go out, and then she went to his office, and there received treatment until the wound was healed. She was under treatment for about three months. The only conversation plaintiff had with any one connected with the defendants was with Miss McGrath, and he does not tell what that conversation was. It was at the house of Mrs. Knack, with whom Miss Senken lived. Miss McGrath testified:

"The doctor asked me if Mr. McAllister had said anything in regard to him taking care of the girl. I said he hadn't said anything to me. He says, 'Well, I would like to make the bill as reasonable as possible for Mr. McAllister, and at the same time take care of the girl properly.' I said: 'Well, I don't know what Mr. McAllister would do in a case of this kind. We have never had an accident before, and it would be better to see him.' So he said he would call and see Mr. McAllister."

Miss Senken testified that she heard this conversation, and states it as follows:

"Miss Margaret McGrath came to my house several times while the doctor was there. One time he asked her if Mr. McAllister says anything, and if it was all right about the bill; and she says to him that she thought that Mr. McAllister was a very good man, and that he would pay the bill."

Mr. Knack, husband of Mrs. Knack, testified that in June, after the accident, he went to defendant James, and asked him to help the girl; that he declined, and, after a little while, said, "I will pay the doctor's bill." Mr. Kissane, one of the attorneys for plaintiff, testified:

"I went to see James McAllister with a view of collecting the bill in controversy at the request of Dr. Holmes, shortly before the commencement of this suit. I told him the doctor was claiming $104. I demanded the payment of the bill. He declined to pay the full amount, and said that he was willing to pay the first visit, whatever that might be worth, but he didn't think he ought to pay the entire bill; that the calling of the doctor by the forelady was all right; it was something that he would have done himself, had he been there in the laundry at the time, and that he didn't go back on that, and whatever was reasonable for that first visit he was willing to pay."

The above is all the testimony bearing upon the liability of the defendants.

Plaintiff called in two physicians, one for advice and another to assist him in an operation, all of which was unknown to defendants. No accident had ever happened in the laundry before. The first intimation the defendants had that plaintiff considered them liable was when they received a bill after the services were rendered.

*Ira A. Lieghley*, for appellants.

*Thomas Kissane* and *C. H. Wilson*, for appellee.

Grant, J. ( *after stating the facts* ). Had defendants' forewoman authority to bind them by sending for plaintiff to attend the injured employé? She had no general authority to do so. If she was clothed with any authority to do so, it must be because an emergency arose in which it was the defendants' duty to have some one to act for them. There are authorities which hold parties liable in certain emergencies for the acts of their managers or foremen in employing physicians. These authorities, however, go no further than to hold the parties liable for the

immediate services made necessary by a present urgency. Authority to act is implied from the necessity of the case. *Chaplin* v. *Freeland*, 7 Ind. App. 676 (34 N. E. 1007); *Terre Haute, etc., R. Co.* v. *McMurray*, 98 Ind. 358 (49 Am. Rep. 752); *St. Louis, etc., R. Co.* v. *Hoover*, 53 Ark. 377 (13 S. W. 1092); *Louisville, etc., R. Co.* v. *Smith*, 121 Ind. 353 (22 N. E. 775, 6 L. R. A. 320); *Arkansas Southern R. Co.* v. *Loughridge*, 65 Ark. 300 (45 S. W. 907). Neither the authorities nor reason carry the rule beyond the emergency. Such employment does not make the employer liable for the services rendered by the physician to the employé after the emergency has passed. If the physician desires to hold the employer responsible for subsequent services, he must make a special contract with him.

The cases above cited, and others, are those in which the employment is hazardous, exposing the employés to dangers and risks greater than those in the ordinary pursuits of life. The ground for such liability is thus stated in *Chaplin* v. *Freeland, supra:*

"Railroad companies occupy a peculiar position with reference to such matters, exercising *quasi* public functions, clothed with extraordinary privileges, carrying their employés necessarily to places remote from their homes, subjecting them to unusual hazards and dangers. The law has, by reason of the dictates of humanity and the necessities of the occasion, imposed upon such companies the duty of providing for the immediate and absolutely essential needs of injured employés, when there is a pressing emergency calling for their immediate action. In such cases, even subordinate officers are sometimes, for the time being, clothed with the powers of the corporation itself for the purposes of the immediate emergency, and no longer."

There is no evidence in this case that employment in a laundry is accompanied by any such dangers. We may infer the contrary, as no accident had ever before occurred in the defendants' business, an extensive one. An employé in a bank, store, or shop, or upon a farm, may

become suddenly very ill, or in some way seriously injured, so that some foreman or other employé might properly deem immediate medical attendance necessary, and, in the absence of the employer, summon a physician. Is the employer liable? We are cited to no authority which so holds. It is doubtful whether such an employer would be liable if he himself sent for the physician to attend one of his employés. It is unnecessary upon this point to express an opinion. We do not, however, hesitate to hold that, in those avocations of life unaccompanied by dangers, an employer is not liable for the services of a physician summoned by his manager or foreman or other servant to attend an employé in a case of sudden illness or injury, whatever his moral obligation may be. If, therefore, the plaintiff had known that Miss McGrath summoned him, the defendants would not be liable. He did not know and made no inquiries as to who summoned him. He testified, "A boy from their office summoned me from the laundry." He never informed defendants that he was treating her, or that he expected them to pay him, or presented a bill, until he had ceased to treat her. He now seeks to bind defendants, not only for his own services, but for the services of other physicians whom he employed to assist him without their knowledge or assent. He could, in no event, recover for the services of the other physicians. *Mayberry* v. *Railroad Co.*, 75 Mo. 492. We therefore hold that there was no original contract.

2. There is no evidence of ratification. The testimony of Mr. Knack and the attorney, Mr. Kissane, does not show a ratification. To Mr. Kissane defendant James denied liability, though willing to pay for the first visit at the laundry. As already shown, defendants were not originally liable. The language of Knack and Kissane imports no more than the promise to pay the debt of another, which is void under the statute of frauds.

Judgment reversed, and new trial ordered.

The other Justices concurred.