## MAHONE v. P. E. HARRIS & CO.

(First Division. Juneau. August 3, 1918.)

No. 1724–A.

1. **Corporations** ⊚⊐407(1)—**Authority to Employ Physician.**

Suit against a cannery company to recover for medical services rendered to an injured employee of a cannery company at request of one in charge of company's business. On motion for nonsuit for failure to show authority of officers of the cannery company to bind the corporation for such service to an employee, *held*, there is no implied authority in an official of a cannery company to bind the corporation for medical services rendered to one of its employees.

⊚⊐See same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

**2. Corporations ☞426(2)—Contracts—Ratification.**
        Ratification can only be made by one who has power to make the contract in the first instance. If the president and general manager had authority, either express or implied, from the defendant's board of directors to employ the plaintiff to render the services sued for, on behalf of the corporation, then he could, no doubt, give validity by ratification of the superintendent's contract.

The complaint in this case alleges that defendant "is a corporation doing business in Alaska, and was so engaged at all the times herein mentioned"; that on or about May 4, 1915, one George Bennett received personal injuries *while in the employ of defendant;* that defendant employed Dr. Sloane to treat said Bennett, which Dr. Sloane did; that the reasonable worth of his services was $300, no part of which has been paid; and that plaintiff is Sloane's assignee and sues as such. The answer denies that Bennett received personal injuries while in the employ of the defendant, and denies that defendant ever contracted to pay for the services of a physician.

The case was tried to a jury, and at the conclusion of plaintiff's evidence defendant moved for a nonsuit, on the ground that there was no evidence of any contract between the plaintiff and the defendant. The nonsuit was granted. The matter comes up now on a motion by the plaintiff for a new trial.

H. L. Faulkner, of Juneau, for plaintiff.
Hellenthal & Hellenthal, of Juneau, for defendant.

JENNINGS, District Judge. The only testimony as to the employment of Dr. Sloane was the doctor's own testimony, which was substantially as follows:

"I was telephoned to by some one on the Pacific Coast Steamship Company's wharf, telling me there was a man from Hawk Inlet injured, and that I was wanted to go get him and take him to the hospital. I met the boat, and Mr. Spaulding told me they had a man injured, and wished me to take him to the hospital and take care of him. Later in the day he told me to take good care of him —look after him—and the company would be responsible for it. He told me to employ medical help. I told him Dr. Mahone had seen the case with me, or would see the case with me, and always helped me on my cases, and he would be the one I would ask."

On cross-examination, in answer to the question, "What was the reasonable value of treating that arm in the first instance, to bandage it and give Mr. Bennett first-aid treatment?" Dr. Sloane answered:

"I never give first-aid treatment. What I do is permanent, not first aid. First aid, you understand, is when something is done quickly, hurriedly, in order to rush the patient to the hospital, where he can get permanent treatment. A doctor does not give first-aid treatment, especially if the doctor is at his office or at a hospital. He does not render first-aid treatment."

The evidence showed that defendant "operated a salmon cannery at Hawk Inlet, Alaska"; that P. E. Harris was president; that said Spaulding was the man in charge of the company's business and property at Hawk Inlet, Alaska, during the absence of said P. E. Harris in 1914 and 1915. The services charged for consisted in diagnosing and in skin grafting, were concluded in about a month or so, were worth the sum charged, and were unpaid for.

There was no evidence to show that Bennett was injured *in the course of his employment,* nor to show how he came to be injured, nor to charge the defendant or its officers, agents, instrumentalities, or business in any way whatsoever with the infliction of his injuries, except the bare statement of Dr. Sloane that "I believe he was injured in the cannery—caught in a shaft." Indeed, the evidence that Bennett was an employee of defendant at the time of the injury was vague and unsatisfactory.

No articles of incorporation were introduced, nor was there any evidence showing the domicile of the corporation, or its objects and purposes, or the habitat of its officers, or the scope of authority of such officers. Nor was there any evidence of custom, usage, or the previous payment by the defendant of bills for medical attendance upon its employees.

But, assuming that Bennett was an employee of defendant and was injured in the course of, or from some cause arising out of and connected with, his employment, the question would be, "Is there any evidence that Spaulding had authority to bind the corporation to pay for the physician's services?" If Spaulding had any such authority, it must be by virtue of the fact, as testified to by Sloane and Ewing, "that Spaulding was the man in charge of the company's

business at Hawk Inlet, Alaska, in the absence of Harris." But what is the company's business at Hawk Inlet? The answer is that it was operating a salmon cannery there. That is all.

Normally it is no part of a master's business, duty, or obligation to pay for medical services rendered to an employee. 5 Labatt, § 1999, and cases cited in note 5, p. 6179. And no agent can bind the master so to do, unless that agent have authority.

"Granting (also disputed) that the president and the secretary of the company requested the services, and on behalf of the company promised remuneration therefor, the record is without evidence to show that the services rendered were for its benefit or in satisfaction of a claim, if any there might be, against it. 'Persons dealing with the officers of a corporation, or with persons assuming to represent it, are chargeable with notice of the purpose of its creation and its powers and with the authority, actual or apparent, of its officers or agents with whom they deal.' Wilson v. Kings County El. R. Co., 114 N. Y. 487, 491, 21 N. E. 1015, 1016. The contract presently in suit may not be said to fall within the purpose of the creation of the Vienna Ice Cream Company, nor does the evidence disclose corporate benefit, or authority, actual or apparent, in its president or secretary, to obligate it in the particular instance. Cf. Kipp v. East River El. Light Co. (Com. Pl.) 19 N. Y. Supp. 387. Individually liable they might be, but not the corporation, whose officers they may be. The judgment must therefore be reversed, and a new trial ordered, with costs for the appellant to abide the event.

"Judgment reversed, and new trial ordered, with costs for the appellant to abide the event. All concur."

There is a line of authorities holding that *in cases of railroads* such authority may be inferred to exist in the general manager, superintendent, conductor, or an employee of even inferior grade, and the reason for such implied authority has been thus stated in Chaplin v. Freeland, 7 Ind. App. 676, 34 N. E. 1007:

"Railroad companies occupy a peculiar position with reference to such matters, exercising quasi public functions, clothed with extraordinary privileges, carrying their employees necessarily to places remote from their homes, subjecting them to unusual hazards and dangers. The law has, by reason of the dictates of humanity and the necessities of the occasion, imposed upon such companies the duty of providing for the immediate and absolutely essential needs of injured employees, when there is a pressing emergency calling for their immediate action. In such cases, even subordinate officers are sometimes, for the time being, clothed with the powers of the cor-

poration itself for the purposes of the immediate emergency. * * *
Railroad Co. v. McMurray, 98 Ind. 358; Railroad Co. v. Mylott (Ind.
App.) 33 N. E. Rep. 135. Many authorities cited in these cases rec-
ognize the rule to be that the general manager of a railroad has
power to employ physicians on behalf of his road. Railroad Co. v.
McVay, 98 Ind. 391. It is also a matter of common knowledge that
railroad companies habitually and regularly employ surgeons and
physicians in connection with the conduct of their roads."

And again, in Cushman v. Cloverland Coal & Mining
Co., 170 Ind. 406, 84 N. E. 760, 16 L. R. A. (N. S.) 1078,
127 Am. St. Rep. 391:

"A modified exception to the rule applicable to railroad companies
is generally recognized, founded upon the exceptional characteristics
and hazards of their operation. Employees of railroad companies,
particularly trainmen, are called upon to perform their duties along
the line of the railroad, extending many miles. When on duty,
they are constantly away from home, often remote, among stran-
gers, and beyond the quick reach of family and friends. In such
cases, when the employee becomes seriously ill, or suffers a severe
injury, and he has available neither family, friends, nor credit, nor
ability to provide for himself the care and medical assistance his
condition imperatively demands, the dictates of humanity cast upon
the employer, as the one nearest in obligation, the duty to provide,
during the continuance of the emergency, whatever is immediately
and urgently required for the preservation of life and limb. It is
only when there is no relative or friend present willing to help the
sick or injured employee at a time of urgent necessity that the
duty and authority rests upon the employer, acting by its highest
representative present, to render assistance. Some one must serve
the helpless man, and the law devolves the duty upon the master
rather than upon a stranger. The duty arises with the emergency
and ends with it. Terre Haute, etc., R. Co. v. McMurray, 98 Ind.
358, 49 Am. Rep. 752; O. & M. R. Co. v. Early, 141 Ind. 73, 81, 40
N. E. 257, 28 L. R. A. 546; Chaplin v. Freeland, 7 Ind. App. 676,
34 N. E. 1007; New Pittsburg, etc., Co. v. Shaley, 25 Ind. App. 282,
58 N. E. 87; 4 Thompson on Negligence, § 3840; 1 Elliott on Rail-
roads, 222.

"But this exception relating to railroads has no bearing on the
question before us. The appellee is a coal-mining company, a strict-
ly private corporation. Its business is stationary. Its employees
perform their duties in one general working place, near their homes,
family, friends, and acquaintances, and have all the facilities for
hastily summoning medical and other aid, in time of pressing emer-
gency, as may be possessed by the corporation. There is no greater
or different reason for holding a private mining corporation re-
sponsible for supplying medical aid for its employees than apper-
tains to all kinds of manufacturing bodies, and we perceive no
reason why either class of corporations, under ordinary circum-

stances, should be required to furnish their workmen with medical service any more than they should be required to furnish them with their dinner. The policy of the law is to protect the employee, equally with the employer, in the fullest freedom of choice in supplying his personal wants of every kind, whenever he is as capable and well prepared as his employer to act for himself. We do not, however, hold that a case cannot arise with a mining or manufacturing company, or even with an individual, wherein the facts may be so unusual and extreme as to impose upon the employer a duty analogous to that imposed on railroad companies. But no such a case appears under the facts alleged in the complaint. It is alleged in the complaint that the defendant is a corporation organized for, and engaged in, the business of mining coal; that the plaintiff was personally injured while at work for the defendant as one of its employees. There is no averment that either the mine superintendent, or the president and general manager, had received authority from the corporation to contract for or to ratify the employment sued upon, either expressly or by implication. We are not informed even of the nature of his employment, whether as engineer, blacksmith, miner, or other particular service. Neither are we informed of the nature or extent of his injury, nor the facts that created the emergency that imposed upon the coal company the duty of employing the plaintiff. It is not averred that the injured employee was unable to help himself, or that he had no money, or credit, or family, or friends present to give him assistance, nor is it shown by the complaint that there existed any other reason why he was not as able and competent to speedily summon a physician as the company."

There are authorities holding that such power is to be implied in cases of emergency, first aid, extreme necessity, etc., custom or usage, or injuries for which the company is liable. 5 Labatt, § 2004, d, note 8.

But it is difficult to perceive upon what principle of law the power contended for can be held to exist in the case of manufacturing or commercial establishments, unless some such special circumstances are shown. Every case must depend upon the facts shown in that case. There is no such implied authority ex vi termini manager, superintendent, or even president of a manufacturing or commercial establishment. Harris v. Vienna Ice Cream Co., 46 Misc. Rep. 125, 91 N. Y. Supp. 317; Chaplin v. Freeland (Ind. App.) supra (injury in a buggy factory); Cushman v. Cloverland Coal & Mining Co. (Ind.) supra (injury in a coal mine); Holmes v. McAllister, 123 Mich. 493, 82 N. W. 220, 48 L. R. A. 396 (injury in a laundry); Harris v. Vienna Ice Cream Co., 46

Misc. Rep. 125, 91 N. Y. Supp. 317 (injury in an ice cream factory); Sourwine v. McRoy Clay Works, 42 Ind. App. 358, 85 N. E. 782 (injury in clay works); Spelman v. Gold Coin Min. & Mill. Co., 26 Mont. 76, 66 Pac. 598, 55 L. R. A. 640, 91 Am. St. Rep. 402 (injury in gold mine); Atlantic Refining Co. v. Leffingwell & Berry, 61 Fla. 101, 54 South. 266, 34 L. R. A. (N. S.) 351 (injury in mine).

In the case of Hunicke v. Meramec Quarry Co., 262 Mo. 560, 172 S. W. 43, L. R. A. 1915C, 789, Ann. Cas. 1915D, 493, cited by plaintiff, there was present the element of dire emergency. The employee had been grievously injured and bled to death through the gross negligence, inactivity, and delay of the employer. The circumstances there detailed betoken little less than manslaughter. There the employee's administrator brought action for damages for death by, wrongful act.

Plaintiff also cited the case of Rich v. Edison Electric Co., 18 Cal. App. 354, 123 Pac. 231; but a careful perusal thereof will show the difference between the circumstances under which the hospital expenses were incurred and those under which the surgeon's charged were incurred. The former were allowed, the latter were disallowed.

But it is contended that the action of Spaulding in employing Sloane was ratified by the company; such alleged ratification consisting in the words and action of Harris, president of the defendant company. The answer is twofold: First, the evidence is insufficient in law to constitute a ratification; second, Harris is not shown to have had any authority to make the contract in the first place, and so no authority to bind the company by any ratification he might make. The only account of Harris' words or actions is found in the testimony of Dr. Mahone, which was substantially as follows:

"I don't know the exact date of my conversation with Mr. Harris; but he came to my office, talking about Mr. Bennett, and told me that he had been a friend of his for a long time—at least, that he was more or less of an old friend. He told me he was there because he was a friend of Mr. Bennett, and wanted to talk things over with me, to arrive at some definite understanding as to compensation; and he asked me what I thought—if I could give him an idea of what it would amount to, and I was thinking the thing over, and he said, 'Now,' he said, 'we are spending a great deal of

money putting in new traps, etc., and I want you to make this just as light as possible;' and he told me, further, that Mr. Bennett, he knew that he was up against it pretty hard, and all that sort of thing, paying for a house down below, and he said he wanted me to make this thing as light as possible; that the cannery had not made any profit to speak of the year before, and that they were under new expense, and that was the reason he wanted me to make it as small as possible; and I told him I would make an estimate, and I thought $300 would be a very fair compensation; and he said, 'I think that will be perfectly satisfactory.' A very few days after Mr. Bennett was sent below, I wrote a letter saying Mr. Bennett had gone below, and I was inclosing a bill for $300. I never received any reply to that letter. When Harris was here, he had not told me he wanted me to quit my treatment of Mr. Bennett. He said he wanted me to do the best I could by the case; he was a deserving man."

And further on the doctor testified:

"Well, receiving no reply or compensation for my bill, when I went to Seattle after, I think it was the following winter, as nearly as I remember—I think December, 1916; I would not be real certain whether it was December, 1915, or 1916, but I think it was 1916 —and during the time I was in Seattle I thought I would call on Mr. Harris and see if he would give me any satisfaction in regard to my statement, and I saw Mr. Harris in his office in Seattle, and we talked over the case. I inquired as to how Mr. Bennett was, and what had been done for him in Seattle, and Mr. Harris showed me a lot of pictures and drawings that had been made to show that the company was not responsible for Mr. Bennett's accident, and he told me at that time that he was quite sure that I would be paid this $300 by Mr. Bennett's lodge, because he was a member of one of the lodges in Seattle, and that he was quite sure in time this bill would be paid by the Masonic lodge there."

Now, there is not here any evidence pointing to ratification by Harris for the company. Quite the contrary; the evidence seems to point to the fact that Harris' visit was because "he was more or less an old friend" of Bennett's, and he wanted the doctor "to make it light," because he (Bennett) "was up against it pretty hard—paying for a house down below." When the amount, $300, was decided upon, Harris' answer was, "I think that will be perfectly satisfactory." It is obvious that he meant satisfactory to Bennett. If a ratification by him for the company (assuming that he could ratify) was in contemplation, he would have said: "That will be satisfactory."

But, granting defendant's contention that Harris "ratified," I· think the law is that Harris could not bind the company by ratification, even though he were the president:

"Ratification can only be made by one who has power to make the contract in the first instance. If the president and general manager had authority, either express or implied, from the defendant's board of directors to employ the plaintiff to render the services sued for on behalf of the corporation, then he could, no doubt, give validity by ratification to the superintendent's contract. Hord v. State, 167 Ind. 622, 79 N. E. 916. Does the complaint show that he possessed such power? Corporations act exclusively by agents. The officers, principal and subordinate, are but agents, created and granted all their powers by the board of directors. In respect to being commissioned to act for the principal, the agent of the corporation, of whatever station or rank, is governed by the same general rules and principles of the law as the agent of an individual. National State Bank v. Vigo Co. National Bank, 141 Ind. 352, 355, 40 N. E. 799, 50 Am. St. Rep. 330; Gravel Road Company v. Slaughter, 33 Ind. 185. The naked act of investing the individual with the office of president gives him very little power to act for the .corporation. He has no power to bind it in material matters, except as he may be authorized by law, or by the board of directors. L., E. & St. L. R. Co. v. McVay, 98 Ind. 391, 49 Am. Rep. 770; National State Bank v. Vigo County Bank, 141 Ind. 352, 355, 40 N. E. 799, 50 Am. St. Rep. 330. When the president and general manager does an act within the domain of the general objects or business of the corporation, and within the scope of the usual duties of the chief officer, it will be presumed that he had the authority to do it, and whoever would assert the contrary must prove it. But when a chief or other officer performs an act, not incidental, or pertaining to the chartered business of his corporation, *nor ingrafted thereon by a well-established usage*, it must as a general rule be alleged and proved that he was duly authorized by the directors. Louisville, etc., R. Company v. McVay, 98 Ind. 391, 394, 49 Am. Rep. 770, and cases cited. Another general rule, apparently of universal acceptance, is that officers of corporations organized for, and engaged in, commercial pursuits, without special authority, cannot, as a legal right, charge the corporation with the employment of physicians and surgeons to attend upon sick or injured employees. The rule is even applicable to railroad companies. No court, we think, has gone so far as to hold that even the general manager of a railroad may, on behalf of the company, engage generally in providing medical aid to sick and injured employees and passengers, especially where it is not shown, as in this case, that the sickness or injury was the result of the company's negligence." Cushman v. Cloverland Coal & Mining Co., supra, 170 Ind. 404, 84 N. E. 759, 16 L. R. A. (N. S.) 527, 127 Am. St. Rep. 391.

See, also, Spelman v. Gold Coin Mining & Milling Co., supra, 26 Mont. 76, 66 Pac. 599, 55 L. R. A. 640, 91 Am. St. Rep. 402.

The motion for a new trial is denied.

⬦See same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes