AUGUST HUNICKE, Administrator of Estate of FRED R. HUNICKE, v. MERAMEC QUARRY COMPANY, Appellant.

In Banc, December 19, 1914.

1. **PHYSICIAN: Services Rendered at Request of Third Party.** Where a physician or surgeon renders services to one at the mere request of a third party on whom there rests no obligation to provide such service, the law will not imply a contract on the part of the person receiving the service to pay therefor.

2. **NEGLIGENCE: Injury of Employee: Emergency: Duty of Master to Procure Medical Treatment.** When an employee is engaged in a dangerous work for the master and, while in the performance of his duties, is so badly injured that he is thereby rendered physically or mentally incapable of procuring medical assistance for himself, the duty is devolved upon the master, as a matter of law, to procure such assistance for him, with reasonable diligence and in a reasonable manner, through the agency of such of his employees as may be present at the time; and a violation of that duty is negligence, for which the master must respond in damages, if there is evidence tending to show that the negligence was the proximate cause of the injured employee's death.

3. ———: ———: ———: ———: **Diligence: Question for Jury.** Deceased, a young man twenty-three years of age, was in the employ of defendant at its stone quarry about two miles from a railroad station, and thirteen miles from a city station, near which was a hospital. From the main line of the railroad to the stone quarry was a railway track maintained by the quarry company, and as a coal car was being transported over said track, the young man was struck by a moving car, the bone of his leg, six or seven inches below the hip joint, was badly broken and crushed, a large hole torn in the flesh, and the skin, veins and arteries lacerated, followed by a profuse flow of blood. The superintendent by telephone called upon a physician at the railroad station to come quickly, who replied that it was impossible for him to leave a dying patient, and directed that the injured man be placed upon a hand car and brought to the station, and promised if that were done he would treat him there; and an hour later the call and reply were repeated. No reason was given why the physician's directions were not obeyed except the track was rough and the jolting would have increased the flow of blood. There were other physicians in

near-by towns, but none of them were called.  There were also automobiles at hand and in the city, but none of them were called into use to take the man to the city, and the excuse given was that the roads were rough and the jostling would increase the flow of blood.  The superintendent telephoned to the general offices of the quarry company in the city, and was instructed to bring the boy to the city on a passenger train, which was due to arrive at the station three hours after the accident, but arrived one hour behind schedule.  It was suggested to the superintendent that a rope be tied around the man's leg above the injury, but he said it would do no good.  The blood continued to flow, and the man was removed to the company's office, where a sheet was placed over and under the injured parts, and four hours after the accident he was placed upon the hour-late passenger train and taken to the city, where he was met by automobile, surgeons and nurses and taken to a near-by hospital, and the leg bandaged.  At the time he was practically without blood, though still rational.  An amputation was at once performed, but in a few hours he died.  *Held*, that the evidence tended to show that the quarry company was guilty of negligence in not using more diligence to procure medical and surgical treatment for the young man, and also to show that said negligence was the proximate cause of his death, and whether or not such negligence existed was a question for the jury.

4.  ———: ———: ———: ———: **Basis for Rule.**  Where a servant, in performing dangerous work for his master, is so badly injured as to be incapacitated to care for himself, the duty of providing medical treatment is devolved upon the master; and the rule is based upon the unexpressed humane and natural understanding existing between civilized men that wherever any one is so injured that he cannot care for himself then those who stand by and have directly or indirectly contributed to his injury owe him the duty of trying, while the emergency lasts, to alleviate his suffering or save his life, and that rule is but the application or extension of the common-law rule which requires the master to furnish his servant with a safe place in which to work and safe instrumentalities with which to perform his labor.

5.  ———: ———: ———: **Proximate Cause of Injury: Instruction.**  In a suit for damages for negligent failure by an employer to furnish a dangerously injured employee prompt medical assistance, an instruction should not tell the jury that if they are unable to determine whether the deceased would have died from the injury received, even though proper medical assistance had been promptly furnished him, then they should find for the defendant.  Such an instruction raises a purely metaphysical speculation, since no man can

262Mo36

answer it with certainty. The law is that as soon as the dangerous injury occurred, while the employee was in the discharge of his work for the master, it became the master's duty, in the emergency, to use diligence to provide medical treatment for him, and if the evidence shows his negligent failure to employ reasonable efforts to do so in all reasonable probability was the proximate cause of the employee's death, the master is liable. On the other hand, the court should instruct the jury for defendant that if they believe from the evidence that the injury was the direct and proximate cause of his death, the master is not liable.

Appeal from St. Louis City Circuit Court.—*Hon. George H. Shields,* Judge.

AFFIRMED.

*J. E. Carroll* and *Watts, Gentry & Lee* for appellant.

*Joseph Wheless* for respondent.

WOODSON, P. J.—This suit was instituted in the circuit court of Jefferson county by the plaintiff, as administrator of the estate of Fred R. Hunicke, deceased, against the defendant, to recover the sum of $10,000 damages for the death of said Fred, caused by the alleged negligence of the defendant in failing to procure a physician or surgeon to attend and treat him upon receiving severe personal injuries while in the employ of the defendant.

The trial resulted in a verdict and judgment for the defendant, which, upon timely motions for a new trial and in arrest of judgment having been filed, were by the circuit court sustained and a new trial ordered for certain reasons assigned, which will be presently noticed. From this action of the court in ordering a new trial the defendant timely and properly appealed the cause to this court.

Counsel for the defendant insist that the petition does not state facts sufficient to constitute a cause of

action against it; and for that reason we are required to set it out and pass upon its sufficiency.

Formal parts omitted, the petition reads:

"Plaintiff, August Hunicke, states that he is a resident of Jefferson county, Missouri, and that he is the duly appointed and qualified administrator of the estate of his son, Fred R. Hunicke, who came to his death in said county of Jefferson on the 12th day of March, 1909; and the defendant, Meramec Quarry Company, is a corporation under the laws of the State of Missouri, engaged in conducting a stone quarry at a point called Wicks, on the main line of the St. Louis, Iron Mountain & Southern Railroad Company, in said Jefferson county, Missouri, and said defendant company has an office and place of business at Wicks in said Jefferson county, Missouri.

"Plaintiff further states that his said son, Fred R. Hunicke, on and for some time prior to the 12th day of March, 1909, was in the employ of the defendant corporation at its said quarry at Wicks; that said defendant company at that time maintained a certain track of railroad extending from the said main line of the said Iron Mountain Railroad Company into the private yards of the said quarry company, to its plant; that on said 12th day of March, 1909, while certain cars loaded with coal for the use of the defendant company were being transported over said spur track into the private yard of the defendant company, plaintiff's said son, Fred R. Hunicke, was struck by said moving cars, and was severely crushed and injured by the same; and plaintiff states that the wheels of said moving cars ran over his said son, and broke and crushed the bones of his right leg several inches below his thigh, and lacerated the flesh, muscles and veins of his leg, and tore a large hole in the same, through which the bones of his leg protruded, so that blood flowed from said wound in large quantities; that said wounds were of such a nature, and the flow of blood therefrom

was in such quantities, that it created a sudden emergency that required the immediate attention and service of a physician or surgeon to treat and dress said wound and stop said flow of blood; said injuries being of such a nature as to require the amputation of the deceased's said right leg.

"And plaintiff avers that owing to the said serious injury so occasioned to his said son, and the sudden emergency thus created, it became and was the duty of the defendant company to render prompt and immediate assistance and surgical aid to his said son, in order to stop the flow of blood from his body and to save his life; and plaintiff avers that if prompt and proper surgical attention had been furnished his son, and the flow of blood from his wounds had been stopped within a reasonable time, his said son's life would have been saved, with no other serious consequences than the loss of his said right leg; and plaintiff avers that the said defendant company, recognizing the duty thus imposed upon it by the said sudden emergency, did assume and undertake to render surgical assistance and first aid to his said son, but in so doing acted in such a careless and negligent manner that his said son was allowed to bleed to death before any effective assistance was furnished him.

"Plaintiff avers that the point at which his said son was injured in the yards of the defendant company was within a few hundred feet from the main tracks of the said Iron Mountain Railroad, and distant but two miles from the town of Kimswick, in said Jefferson county, and was only about fifteen miles from the Broadway Station of the said railroad in the city of St. Louis, and that just beyond Kimswick and within a few miles of the scene of said injuries, there are several other towns at which competent and skillful surgeons reside and could have readily been obtained, and to any of which stations on said railroad plaintiff's said son could have readily and speedily been trans-

ported and taken to any of such surgeons or physicians, and said defendant company had then and there in its said yard a number of hand cars used in its work of hauling stone, and which were adapted to run on the tracks of said railroad, upon which plaintiff's said son could have been easily taken to any of the neighboring towns or to St. Louis; and plaintiff avers that his said son was injured a few minutes after nine o'clock in the morning of said day, and at a time when a local passenger train, southbound, was standing on the said Iron Mountain tracks very close to the point where his said son was injured; and the said defendant company could readily have detained it, or have intercepted it before it reached said town of Kimswick, so that plaintiff's said son could have been transported on said train to a suitable place where the surgical attention could have been given him.

"Plaintiff further avers that the superintendent of the defendant company in charge of said quarry was present at the time his said son was injured; that said superintendent thereupon directed other servants of the defendant company to carry plaintiff's said son to the office of the company adjacent to the said main line of the Iron Mountain Railroad, and accompanied him to said office, and caused him to be laid on a cot which was there provided for him; that said superintendent examined said injuries, and saw the great amount of blood that was being lost through said wounds, and realized their serious nature and the urgent necessity of securing immediate surgical attention, and his duty in such emergency to furnish the same; that in consequence thereof he immediately telephoned to a competent surgeon in the said town of Kimswick, and asked him to come at once to Wicks, distant two miles from Kimswick, but that said surgeon replied that he was then busy and could not come, but suggested to said superintendent that he send the injured man to him at Kimswick, which said superin-

tendent carelessly and negligently failed and refused to do, as he very easily could have done. And plaintiff avers that instead of making use of means readily at hand to tie up and bind the leg of the plaintiff's son, and stop the loss of blood, by tying a rope or other bandage around said leg above said wounds, said superintendent of said company carelessly and negligently failed to bind said leg tightly and stop the flow of blood, but only wrapped a sheet loosely around the said injured leg in such a way that the blood continued to flow from said wounds; and instead of calling surgical assistance from some other town, or of transporting plaintiff's said son to such a place where surgical attention could be had, said superintendent carelessly and negligently allowed plaintiff's said son to lie in the office of said company for the space of about four hours, without attention, during all which time he continued to lose large quantities of blood from his said wounds; and carelessly and negligently allowed his said son to remain there without attention until the regular train of the said Iron Mountain Railroad, going to St. Louis, arrived at Wicks nearly one hour later than its usual time; that upon the arrival of said train, defendant's said superintendent placed plaintiff's said son on said train, and telephoned to the defendant's office in the city of St. Louis, to convey plaintiff's said son to the hospital; and the officers of the defendant company in St. Louis called an ambulance, and upon the arrival of said train at said Broadway Station, conveyed plaintiff's said son to the Lutheran Hospital, a short distance from said Broadway Station.

"And plaintiff avers that upon the arrival of his said son in the said ambulance at the said hospital, all of the blood in his body had been allowed to escape, so that, although his said leg was immediately amputated, it was impossible to save his life, and he immediately died as the direct result of the loss of blood occasioned by the careless and negligent attention given

him in said emergency by the officers and servants of the said defendant company. And plaintiff avers that but for the careless and negligent manner in which defendant's said servants discharged the duty which the defendant company owed and assumed towards his said son, and their carelessness and negligence in allowing him to lie several hours without adequate aid, so that he lost all the blood from his body, his life would have been saved, and he would not have died.

"And plaintiff avers that at the time of the death of his said son, Fred R. Hunicke was a young man about twenty-one years and six months of age, and was single and unmarried, and left no widow or children surviving him; and that a cause of action for the said negligence on the part of the defendant company has accrued to him, as administrator of the estate of his said deceased son, in the sum of $10,000, for which amount he asks judgment against the defendant corporation, together with the costs of this suit."

The answer was a general denial.

The facts of the case are practically undisputed, yet there is some conflict among the opinions of expert witnesses.

The evidence for the plaintiff tended to show that the defendant was a corporation duly organized and incorporated under the laws of this State, and was engaged in the stone business, at Wicks, in Jefferson county, and in the city of St. Louis, Missouri.

That the plaintiff was the duly appointed, qualified and acting administrator of the estate of Fred Hunicke, deceased; that deceased was the lawfully begotten son of the plaintiff; that he was never married, and died intestate, leaving his father and mother and brothers and sisters as his only heirs at law.

That deceased was about twenty-two years of age at the time of his death, six feet tall and weighed about one hundred and sixty-five pounds; and that he was

hale, hardy and robust, never sick in his life, nor did he smoke or chew tobacco or drink intoxicating liquors.

That he was employed in the quarry of the defendant on March, 1909, at Wicks, the time when he sustained the injuries mentioned.

The injuries mentioned were caused by a car running over him, belonging to the St. Louis and Iron Mountain Railway Company, while moving on a spur track in the defendant's premises.

That the injuries were most grievous, his right leg being severely crushed and lacerated at a point from four to seven inches below the hip joint. The fractured bone punctured a hole about the size of a silver dollar in the fleshy part of the limb, through which great quantities of blood were freely flowing at the time assistance reached him, which was almost simultaneous with the reception of the injury.

The injury occurred about nine o'clock a. m., and Mr. Buder, the superintendent of the quarry, who was present, at once had Hunicke taken to and placed upon a cot in the company's office building near by, and telephoned to Dr. Kirk, a physician at Kimswick, some two miles distant, requesting him to come at once and treat the injured party. The doctor having been previously called to attend another person who was dangerously ill, so notified Mr. Buder, and stated that he could not come, and that about one hour later he again called the doctor, who replied that he was still engaged, and could not leave the dying patient. Dr. Kirk requested Mr. Buder to take the injured party to Kimswick, which could have been done on a hand-car, then present. Mr. Buder, for reasons not made perfectly clear, declined to take Hunicke to Kimswick as suggested by the doctor.

In the meantime one George Dotzler, who was present, and also an employee of the defendant company, proposed to tie a rope tightly around the leg of the injured party above the injury, so as to stop the

flow of blood; but the superintendent, Buder, told him not to so do, as it would do no good. At a time not made definite by the evidence, Buder notified the manager of the company at St. Louis of the injury, who instructed him to place Hunicke on the next train bound for St. Louis—thirteen miles away—and made arrangements for automobiles, doctors, nurses, etc., to carry him to the hospital in that city for treatment.

The witness George Dotzler, previously mentioned, and who wanted to tie the rope around the injured leg, had served for several years in the United States Cavalry, and had received instructions, as all such do, in rendering the first or emergency aid to injured persons from gun shots or other causes; but the record nowhere shows that Buder had any knowledge of that fact when he told Dotzler that it would do no good to tie a rope around the injured limb.

Mrs. Buder, wife of the superintendent, a good woman, as evidently she was, with a heart full of the milk of human kindness, as soon as she heard of the sad affair, immediately went to the office where Hunicke was resting, and administered unto him all the aid she possessed, trying to alleviate his suffering and make him comfortable, and in order to stanch the flow of blood, she placed a sheet under and over the injuried parts of the limb, and never left him from that time until some four to seven hours afterwards, when he was placed in the care of physicians and nurses in the hospital at the city of St. Louis, save and except for a few moments before starting to the city, she left him to change the blood-stained dress she wore while administering unto his necessities.

The evidence also tended to show that there were other physicians in the near-by towns and villages, but none of them were called; that he could have been taken to the city of St. Louis, thirteen miles away, in an automobile in a comparatively short time as compared

to the time consumed in waiting for the train and car-rying him thither.

Nothing further was done for the injured party until about one o'clock p. m. of that day, when he was put upon a train, sent to the hospital and his leg amputated. During the entire time from the instant of the injury, down to the time the bandage was placed upon his leg in the hospital, four or five hours later, the blood never ceased to flow from this ugly, gaping wound, and when the amputation took place his body was practically bloodless and lifeless, though he was still rational. A few hours thereafter he breathed his last.

The operating surgeons were Drs. Nietert and Konzelman. The latter first attended the young man and testified that the injury was between the middle and upper third of the femur, and the flesh and bone were crushed and lacerated. That he at once administered an anaesthetic and put a rubber band above the injury to stop the flow of what blood was left. He testified that "his loss of blood was to such an extent that there wasn't anything to do for the boy," and that if a bandage had been applied shortly after the accident "the chances are that he would have saved a great deal of blood." That "there is no question about that," but, "I am unable to say whether it would have stopped the flow of blood entirely." "That there was a reasonable probability of stopping the flow entirely by putting on a tight bandage, and probably if there was a tight bandage of stopping the flow of blood." "If a bandage had been promptly applied it would in reasonable probability have stopped the flow of blood, and naturally increased his chances of recovering from the accident." "A towel or rope or leather strap is frequently used in such emergencies to stop the flow of blood."

Dr. Konzelman testified substantially to the same effect.

That almost immediately after the accident occurred Mr. Buder telephoned to his St. Louis office and reported the injury and the serious character thereof. That thereupon the manager directed Buder to bring the injured party to the city of St. Louis and place him in a hospital, and that he engaged an ambulance to meet the train to carry him to the hospital and employed Dr. Nietert to attend the young man upon his arrival in the city. That the St. Louis manager had an automobile and rode in it to the station to meet the parties, but did not go or offer to send the automobile to Wicks, thirteen miles away, to bring the injured party to the city, which would have taken a comparatively short time.

The evidence of the defendant tended to contradict that of the plaintiff, that the injuries sustained by Hunicke were so serious and extensive in character that he would have died in spite of prompt and the best efforts of the most skilled physicians; that his death was caused solely from the injuries received by him and not because of any negligence on the part of the defendant or any of its agents or servants.

That the condition of the injuries was such that it would have been impossible to have safely carried Hunicke on a hand-car or automobile to Kimswick or from Wicks to St. Louis upon either of those carriages; that the roughness of the roads and jar and motion of the body incident to such means of travel, would have kept the wound open and caused the blood to flow more freely than if lying still on a cot in the office of the company at Kimswick or on the train bound for St. Louis.

In other words, the defendant's evidence tended to show that it was in no manner guilty of any negligence in the case, while that for the plaintiff tended to show the contrary.

Thereupon counsel for the plaintiff requested and the court over the objections of defendant, instructed the jury as follows:

"1.   The court instructs the jury that if you find and believe from the evidence, that on the 12th day of March, 1909, Fred R. Hunicke was in the employ of the defendant Meramec Quarry Company, at a stone quarry owned or operated by it in Jefferson county; and that while so employed said Fred was injured at said quarry by his leg being crushed below the thigh, and that said injury was of so serious a character as to render him unable to help himself, and as to endanger his life from loss of blood through his said wounds unless it were promptly checked; and that an emergency was thus created which demanded prompt or immediate aid and surgical attention so as to prevent his bleeding to death; then the court instructs you, that it became the duty of the defendant corporation, through its officers or employees present at the place of accident, to exercise ordinary care in rendering to the injured boy such aid and assistance and to furnish such surgical treatment, in such emergency, as was reasonably possible under all the circumstances surrounding the parties, with a view to stopping the loss of blood and saving the life of the boy, if you find that it was reasonably possible to render any such attention:

"And if you further find and believe from the evidence that if such emergency aid and surgical treatment had been furnished within a reasonable time, it would with reasonable certainty have stopped the flow of blood and prevented the boy's dying from loss of blood (if you find he did die from loss of blood) or would have saved his life; and that the defendant corporation carelessly and negligently failed or unreasonably delayed to exercise such ordinary care in rendering such assistance, if you find that it could have rendered it as above explained; and that the injured boy died as a natural and direct consequence of such

failure and negligence (if you so find), then the defendant corporation is liable in damages for such death.

"And if you further find from evidence that the plaintiff is the administrator of his said deceased son, and that said Fred at the time of his death was over twenty-one years old and unmarried and left no children, then your verdict should be for the plaintiff in a sum not to exceed $10,000.

"2. The court instructs the jury that if you find and believe from the evidence, that on the 12th day of March, 1909, Fred R. Hunicke was in the employ of the defendant Meramec Quarry Company, at a stone quarry owned or operated by it in Jefferson county; and that while so employed said Fred was injured at said quarry by his leg being crushed below the thigh, and that said injury was of so serious a character as to render him unable to help himself, and as to endanger his life from loss of blood through his wounds unless it were promptly checked; and that an emergency was thus created which demanded prompt or immediate aid and surgical attention so as to prevent his bleeding to death;

"And if you further find and believe from the evidence that the defendant corporation, by and through its officers or employees then present, assumed and undertook to render emergency assistance and treatment to said injured boy, by removing him to its office and treating his wounds or by calling a surgeon and sending the boy to the hospital, as mentioned in the evidence;

"Then the court instructs you, that it became the duty of the said defendant corporation, through its said officers or servants to act promptly and to use ordinary care and diligence in binding or treating his said wounds to stop the flow of blood, and to place the wounded boy in the charge of a competent surgeon, if it so undertook to do, within a reasonable time in view

of the nature of his injuries and the circumstances of the case, so as if possible to save his life.

"And if you further find and believe from the evidence, that the defendant corporation, by the use of such care and diligence in furnishing emergency treatment to said injured boy and in placing him in charge of a surgeon within a reasonable time after his injury, could with reasonable certainty have stopped the loss of blood and saved his life, but that it carelessly failed and neglected to use such ordinary care or did those things which it undertook to do in a careless and negligent manner, or unnecessarily and beyond a reasonable time delayed in performing the services which it assumed to render, and that such carelessness and negligence of delay, if any such you find, were the natural and proximate cause of the death of the said Fred R. Hunicke, then the defendant corporation is liable in damages for his death;

"And if you further find from the evidence that plaintiff is the administrator of his said deceased son, and that said Fred at the time of his death was over twenty-one years of age, and unmarried, and left no children, then your verdict should be for the plaintiff and against the defendant corporation, in a sum not exceeding $10,000."

And the court on behalf of the defendant then instructed the jury over the objections and exceptions of plaintiff, as follows:

"1. The court instructs the jury that this suit is not based on any liability of defendant for injuring the deceased Fred Hunicke, by striking or running over him with a car, and therefore plaintiff is not entitled to any verdict at your hands on account of the inflicting of injury upon the deceased Fred Hunicke on the occasion in question.

"2. The court instructs the jury that if you believe and find from the evidence in this case that after the deceased Fred Hunicke was injured the defendant

exercised ordinary care to secure for him surgical and medical treatment at the hands of competent physicians and surgeons, then the defendant fully discharged its duty towards said Fred Hunicke and is not liable to the plaintiff in this case.

"3. By the term 'ordinary care' as mentioned in these instructions is meant such care as a reasonably prudent person would exercise under the same or similar circumstances.

"4. The court instructs the jury that if after considering all the evidence in the case you are unable to determine whether the deceased Fred R. Hunicke would have died from the injury he received on the defendant's premises, even if proper medical assistance had been promptly rendered him, then your verdict must be for the defendant.

"6. The court instructs the jury that if after considering all the evidence in the case you are unable to determine whether the deceased Fred R. Hunicke would have died from the injury he received on the defendant's premises, even if proper medical assistance had been promptly rendered him, then your verdict must be for the defendant."

Counsel for the defendant asked two other instructions, which in effect were in the nature of demurrers to the evidence. Both of these were refused, and the defendant duly saved its exceptions.

I. The first error counsel for defendant complain of is stated in this language:

"The court erred in sustaining plaintiff's motion for a new trial, because the petition does not state facts sufficient to constitute a cause of action against the defendant, and therefore could not have supported a verdict for the plaintiff, if one had been rendered.

**Injury to Employee: Medical Treatment: Emergency: Liability of Master.**

Hence the verdict for the defendant was the only ver-
dict that could properly have been rendered in the case,
and should not have been disturbed.''

In support of this contention we are cited to the
following authorities:  Davis v. Forbes, 171 Mass. 548,
47 L. R. A. 170; Railroad v. Hennegan, 33 Tex. Civ.
App. 314; Gray v. Lumpkin & Thomas, 159 S. W.
880; Pittsburgh, etc., R. R. Co. v. Sullivan, 141 Ind. 83,
50 Am. St. Rep. 313; Spelman v. Gold Coin Mining &
Milling Co., 26 Mont. 76, 91 Am. St. Rep. 402;
Voorhees v. N. Y. Central & H. R. R. R. Co., 114 N. Y.
Supp. 242, 198 N. Y. 558; Vorass v. Rosenberry, 85
Ill. App. 623; Sweet Water Mfg. Co. v. Glover, 29 Ga.
399; Denver & R. G. R. R. Co. v. Iles, 25 Colo. 19; King
v. Interstate Consolidated Street Railway Co., 70 L.
R. A. 924.

The principal legal proposition involved in this
case is somewhat novel, and this is the first time it
has been directly presented to this court for consid-
eration.  For this reason I deem it important that the
authorities relied upon by counsel for the respective
parties as sustaining their respective positions, should
be reviewed somewhat extensively.

However, before undertaking to discuss this
question, it might not be out of place to state the well
known and universally established rule that, ''where
a physician or surgeon renders services to one at the
mere request of a third person on whom there rests no
obligation to provide such service, the law will not im-
ply a contract to pay on such mere request.''  The law
on this question is succinctly and accurately stated in
22 Am. & Eng. Ency. Law, 790, 791, as follows: ''When
a person requests a physician to perform services for
a patient, the law does not raise an implied promise
to pay the reasonable value of the service so rendered,
unless the relation of the person making the request to
the patient is such as raises the legal obligation on his

part to call in a physician and pay for the services.''
[Weinsberg v. St. Louis Cordage Co., 135 Mo. App.
553, and cases cited.]

Orderly conduct requires that we consider, first the
authorities cited by the defendant, the appellant here;
and thereafter those of the plaintiff, the respondent
here.

Before taking up the cases of the defendant in
detail it may be well to state generally none of them
''is on all-fours'' with the case at bar, for the reason
that the question of ''emergency'' so strongly urged
in this case, was not presented or considered in any of
the cases cited by counsel for defendant.

The case of Davis v. Forbes, 171 Mass. 548, l. c.
553, was where a boy, whose exact age was not shown,
sued his employer for personal injuries alleged to have
been sustained by him through the negligence of his
employer and for negligence in not furnishing him with
medical attendance. He was injured by falling from
or by having been thrown from a horse he was training
on a race-course. Neither the character nor the ex-
tent of the injuries was shown, and therefore the ques-
tion of emergency was not involved. The court held,
first, that he could not recover for the injuries sus-
tained, because he assumed the risk, etc.; and, second,
without discussing the question, that: ''An employer
is under no legal obligation to furnish his injured em-
ployees with medical attendance.'' In the light of the
facts of that case, the opinion is of but little weight in
this case.

In the case of Railroad v. Hennegan, 33 Tex. Civ.
App. 314, the company had agreed to furnish the em-
ployee medical service, but having failed to so do, the
latter sued in tort for the injuries he claimed were neg-
ligently inflicted upon him by that failure. In that
case the court simply held that the plaintiff's cause of
action was for a breach of the contract, and not in tort

for negligence.   Consequently that case has no application whatever to the case at bar.

The case of Gray v. Lumpkin, 159 S. W. 880, also grew out of an alleged contract whereby the employer agreed to furnish the employee medical service, which fact renders it inapplicable as an authority in this case.

In the case of Spelman v. Gold Coin Co., 26 Mont. 76, the plaintiff sued the company to recover the value of medical services rendered at the request of the superintendent to one of its injured employees.   The court held that the superintendent, *as such, had no authority to employ* a physician in such a case, in the absence of negligence on the part of the company.   There being no claim of negligence the court added:  ''Query: Whether in a case where an employee is injured through the actionable negligence of the company, the general manager of a mining company can bind his principal by such a contract?''

To the same effect is the case of Voorhees v. N. Y. Central & H. R. R. R. Co., 114 N. Y. Supp. 242, affirmed in 198 N. Y. 558.

It will be observed that the two last cases turned upon the authority of the superintendent to employ the physician, and not the liability of the master, had the physician been employed by a duly constituted agent of the company.   Quaere: If the company was in legal duty bound to furnish medical aid in such case was not the superintendent authorized to employ the physician as a matter of law?

The case of Vorass v. Rosenberry, 85 Ill. App. 623, was a suit brought by a physician against the father of an injured son, to recover for medical services rendered to the later, who was of age, and who was found lying unconscious in the middle of the street where he had fallen from a wagon and fractured his left thigh bone.   The physician, Rosenberry, the defendant in error, was summoned to attend the son by a stranger. The son was removed to the father's house accom-

panied by the physician, who was a stranger to both
the father and son. The son continued to live with his
father and assisted him in his business after attaining
his majority, just as he did prior to that time. The
evidence showed that the father never employed the
physician, and that he did not desire him to treat his
son; but the son insisted upon being treated by this
physician. The circuit court rendered a judgment in
favor of the physician, but upon writ of error the
Court of Appeals reversed the judgment and held the
father not liable.

The case of King v. Interstate Consolidated Street
Ry. Co., 70 L. R. A. 924, involved the legal duty of the
company to furnish its employees with food and shel-
ter, etc. The court held he could not recover. This
case is not in point.

The case of Weinsberg v. Cordage Co., 135 Mo.
App. 553, was a suit to recover a doctor bill. There
the points decided, were: First, did the corporation
have the charter power to employ a physician to treat
an injured employee; and, second, did the president
of the company, without express authority from the
board of managers of the company, have the authority
to employ the physician to treat the injured employee?
In that case the court ruled both of those points in
favor of the plaintiff. The same conclusions were an-
nounced in the case of Freeman v. Baking Co., 126 Mo.
App. 124. Neither of those cases involved the ques-
tion of the *legal duty* of the company, in the absence
of contract, to furnish medical aid to an injured em-
ployee of the company; nor was that question discussed
or decided by the court.

We are also cited to two cases recently decided by
the St. Louis Court of Appeals, Ghio v. Schaper Bros.
Merc. Co., 180 Mo. App. 686, and Newberry v. Missouri
Granite & Const. Co., 180 Mo. App. 672. These cases
were also predicated upon contract. That is, the phy-
sicians who sued for their fees were employed by the

proper officers of the respective companies to perform the services. None of these cases are in point.

Nor is the case of Phillips v. St. Louis & S. F. R. R. Co., 211 Mo. 419, in point. There the railroad company not only agreed to pay the doctor bills and hospital charges, etc., but, in advance, deducted from his and the other employees' wages so much money, estimated to be sufficient to pay all such bills.

Practically all, if not all, of the cases so far considered, were cases where various physicians or surgeons sued various defendants to recover bills for services performed by them to various injured employees of the various defendants. Some of the cases were based upon contracts, and the defenses were that either the company had no charter authority to employ a physician or surgeon in any case, or that the agent of the company, who made the contract on behalf of the company, had no authority from the company to make the same. The remainder of the cases considered, turned upon the point whether or not the agent of the company had the implied authority to employ a physician or surgeon to treat, at the expense of the company, an injured empolyee thereof.

The Supreme Court of Indiana, in the case of Pittsburgh, etc., Railway Co. v. Sullivan, 141 Ind. 83, held that the company was under no general legal obligation to employ medical service for its injured employees; and that if it did so gratuitously and the surgeon amputated a limb of an injured employee against his consent and expressed command, the company would not be liable in damages to the employee for the unlawful amputation.

In the case of Sweet Water Mfg. Co. v. Glover, 29 Ga. 399, the plaintiff, a physician, sued the company for surgical services rendered to one of the company's injured employees. In that case the Supreme Court of Georgia held that, in the absence of contract, the company was not liable to the plaintiff for the services so

rendered, and that the authority of the superintendent of the company, as such, did not authorize him to employ physicians to treat its employees.

In the case of Denver & R. G. R. R. Co. v. Iles, 25 Colo. 19. the supreme Court of Colorado held that the company, in the absence of contract, was not legally bound to furnish medical services to its injured employees; and if, therefore, it neglected or refused to summon medical aid for one injured, while acting within the scope of his employment, it could not be held liable for negligently failing to so do.

The last three cases mentioned, in effect, support the contention of counsel for the defendant, that the petition does not state facts sufficient to constitute a cause of action against it. It will be observed, however, that the question of *emergency* relied upon in this case was not involved or decided in any of those. The emergency in this caes seems to be the differentiating fact between this case and those. In the light of this difference it may be said that counsel for defendant has cited no authority that is directly in point in this case.

Having with considerable care and pains considered the contention of counsel for defendant, that the petition in this case does not state facts sufficient to constitute a cause of action against it, we will now state the position counsel for plaintiff take regarding that question, and then consider the authorities cited by them in support thereof.

The position of counsel for plaintiff is stated in the following language:

"The petition states a good cause of action. An employer, although a corporation, owes a legal duty to an injured employee in the emergency caused by such injury to use reasonable care and diligence in furnishing emergency aid and surgical treatment to such injured employee; and he is liable (1) to the injured employee for failure to perform this duty or for negli-

gence in its performance; and (2) is liable to a physician or surgeon for the cost and expenses of such emergency treatment. And, 'whether the injured employee received his hurt through the negligence of the employer or not is certainly immaterial.' [135 Mo. App. l. c. 568.]'' The authorities cited by plaintiff are as follows: Weinsberg v. St. Louis Cordage Co., 135 Mo. App. 553; Freeman v. Yonge Baking Co., 126 Mo. App. 124; Meisenbach v. Southern Cooperage Co., 45 Mo. App. 232; Powell v. Frisco Railroad, 229 Mo. 246; Brown v. M., K. & T. Railroad, 67 Mo. 122; McCarthy v. Railroad, 15 Mo. App. 385; Evans v. Marion Mining Co., 100 Mo. App. 670; Reynolds v. C., B. & Q. Railroad, 114 Mo. App. 670; Phillips v. St. L. & S. F. R. R. Co., 211 Mo. 419; Ghio v. Schaper Bros. Merc. Co., 180 Mo. App. 686; Newberry v. Mo. Granite & Const. Co., 180 Mo. App. 672; Salter v. Nebraska Tel. Co., 79 Neb. 373; Depue v. Flateau, 111 N. W. 1; Ohio & M. Ry. Co. v. Early, 28 L. R. A. l. c. 551; Railroad v. State to use, 29 Md. 420; Glenn v. Hill, 210 Mo. l. c. 297; Pate v. Tar Heel Steamboat Co., 148 N. C. 571; Bresnahan v. Lonsdale Co., 51 Atl. 624; Farmer v. Central Iowa Ry. Co., 67 Iowa, 136; Louisville, etc., Ry. Co. v. Smith, 121 Ind. 353; Schumaker v. Railroad, 12 L. R. A. l. c. 258; Hill v. Winsor, 118 Mass. 251; Holmes v. McAllister, 48 L. R. A. l. c. 398, 123 Mich. 493; Railroad v. Cappier, 66 Kan. 649, 69 L. R. A. 513, and note, l. c. 533; Railroad v. Marrs's Admx. (Ky.), 70 L. R. A. l. c. 293; King v. Interstate Street Ry. Co., 23 R. I. 583, 70 L. R. A. 924; The Iroquois, 118 Fed. l. c. 1005.

While counsel have cited a great many authorities in support of their proposition, yet we do not feel called upon to review all of them in this opinion; however, we will notice such as we consider as specially applicable to the case.

I do not understand counsel for plaintiff to make the broad claim that, in the absence of the question of *emergency,* presented in this case, it would have been

the duty of the defendant to have furnished medical or surgical treatment for the injured man, upon the occasion mentioned; but I do understand counsel to contend, and which I believe is the law, that when an employee is engaged in any dangerous business for the master, and while in the performance of his duties, as such, he is so badly injured that he is thereby rendered physically or mentally incapable of procuring medical assistance for himself, then that duty as a matter of law, is devolved upon the master, and that he must perform that duty with reasonable diligence and in a reasonable manner, through the agency of such of his employees as may be present at the time.

In other words, without trying to state the law in detail governing the master's duties in all cases of this character, that duty is put in operation whenever, under the facts and circumstances of the case, the employee is thereby so injured that he or she is incapacitated from caring for himself or herself, as the case may be.

The uncontradicted evidence in this case shows that the deceased was so badly injured that he was physically incapacitated to care for himself or to engage medical or surgical treatment; also, that the character of his injuries was such as required immediate surgical attention, for it was apparent to all present that his leg was frightfully crushed, and that his life's blood was freely flowing from his body. So obvious was this that several of those present, at the time of the accident, tried by their crude methods, to stop its flow. But the highest officer of the company present, the superintendent, thought none of their remedies were worthy of trial and told them their proposed treatment would do no good. He then telephoned to Dr. Kirk, at Kimswick, the condition of the injured man, Hunicke, and requested him to come to Wicks and treat the injured man; but the doctor being previously engaged in a serious case, could not leave it. The doctor,

however, telephoned the superintendent to bring the injured party to Kimswick, some two miles distant, and that he would there treat him.

The evidence shows that both Wicks and Kimswick were on the railroad and that a hand-car was present which could have been used in conveying Hunicke from the former to the latter place for treatment.

For some reason not made clear, the superintendent declined to take the injured man to Kimswick for treatment, but telephoned the facts of the injury to the manager of the company at St. Louis, some twelve or fourteen miles distant, who telephoned back to the superintendent to place the injured man on the next train and send him to St. Louis. This was done; and some three or four hours later, the train arrived in the city; and upon the arrival of the train, Hunicke was speedily taken to the hospital where his limb was amputated; but in the meantime practically all of the blood of his body had flowed therefrom; and he died shortly thereafter.

In the statement of the case we have set out much of the evidence tending to show the negligence of the defendant in not procuring surgical treatment for Hunicke more promptly; and that he would not have died had he received prompt treatment. That evidence tended to show that Kimswick was only two miles distant from the place of injury and that the injured man could have been taken there on a hand-car in a very *few* minutes, probably from fifteen to twenty, at the outside. Had this been done, in all probability, the flow of blood would have been stanched several hours before it was finally stopped in the city of St. Louis.

It is true that there was some evidence which tended to show that such a trip on a hand-car would have been rough and jolting, and thereby might have aggravated the flow of the blood, but conceding that to

be true, it could not have caused more waste of blood than did the constant flow during the hours that passed while he was waiting for the train and being conveyed to the city of St. Louis thereon. And it seems to me that common sense would teach us that a trip on a hand-car to Kimswick would not have caused the blood to flow more freely than the trip on the train to St. Louis, six or seven times as far, would have done.

But be that as it may, when we consider those facts in connection with all the other facts and circumstances shown by the evidence, we have reached the conclusion that this, as well as the question of negligence in delaying the procurement of a surgeon, was for the jury, and that the evidence introduced was sufficient to make out a prima facie case for the plaintiff.

In other words, we are of the opinion that the evidence tended to show that the company was guilty of negligence in not using more diligence in procuring medical and surgical treatment for this party; also that it tended to show that said negligence was the proximate cause of his death.

These views, in our opinion, are fully supported by the following authorities, which we will briefly review:

In the case of Railroad v. Cappier, 66 Kan. 649, l. c. 650, the Supreme Court of that State, in discussing this question, said:

"While attempting to cross the railway tracks Ezelle was struck by a moving freight car pushed by an engine. A yard-master in charge of the switching operations was riding on the end of the car nearest to the deceased and gave warning by shouting to him. The warning was either too late or no heed was given to it. The engine was stopped. After the injured man was clear of the track, the yard-master signaled the engineer to move ahead, fearing, as he testified, that a passenger train then about due would come upon them. The locomotive and car went forward over a bridge,

where the general yard-master was informed of the accident and an ambulance was summoned by telephone. The yard-master then went back where the injured man was lying and found three Union Pacific switchmen binding up the wounded limbs and doing what they could to stop the flow of blood. The ambulance arrived about thirty minutes later and Ezelle was taken to a hospital, where he died a few hours afterward.

"In answer to particular questions of fact, the jury found that the accident occurred at 5:35 p. m.; that immediately one of the railway employees telephoned to police headquarters for help for the injured man; that the ambulance started at 6:05 p. m. and reached the nearest hospital with Ezelle at 6:20 p. m., where he received proper medical and surgical treatment. Judgment against the railway company was based on the following question and answer:

" 'Q. Did not defendant's employees bind up Ezell's wounds and try to stop the flow of blood as soon as they could after the accident happened? A. No.'

"The lack of diligence in the respect stated was intended no doubt, to apply to the yard-master, engineer and fireman in charge of the car and engine.

"These facts bring us to a consideration of the legal duty of these employees toward the injured man after his condition became known. Counsel for defendant in error quotes the language found in Beach on Contributory Negligence (3 Ed.), section 215, as follows:

" 'Under certain circumstances, the railroad may owe a duty to a trespasser after the injury. When a trespasser has been run down, it is the plain duty of the railway company to render whatever service is possible to mitigate the severity of the injury. The train that has occasioned the harm must be stopped, and the injured person looked after; and, when it seems nec-

essary, removed to a place of safety, and carefully nursed, until other relief can be brought to the disabled person.'

"The principal authority cited in support of this doctrine is Northern Central Railway Co. v. State, use of Price et al., 29 Md. 420, 96 Am. Dec. 545. The court in that case first held that there was evidence enough to justify the jury in finding that the operatives of the train were negligent in running it too fast over a road crossing without sounding the whistle, and that the number of brakemen was insufficient to check its speed. Such negligence was held sufficient to uphold the verdict and would seem to be all that was necessary to be said. The court, however, proceeded to state that, from whatever cause the collision occurred, it was the duty of the servants of the company, when the man was found on the pilot of the engine in a helpless and insensible condition, to remove him, and to do it with proper regard to his safety and the laws of humanity. In that case the injured person was taken in charge by the servants of the railway company and, being apparently dead, without notice to his family, or sending for a physician to ascertain his condition, he was moved to defendant's warehouse, laid on a plank and locked up for the night. The next morning, when the warehouse was opened, it was found that during the night the man had revived from his stunned condition and moved some paces from the spot where he had been laid, and was found in a stooping posture, dead but still warm, having died from hemorrhage of the arteries of one leg, which was crushed at and above the knee. It had been proposed to place him in the defendant's station-house, which was a comfortable building, but the telegraph operator objected, and directed him to be taken into the warehouse, a place used for the deposit of old barrels and other rubbish."

While the court decided that case against the plaintiff because he was a trespasser and not an employee,

yet it clearly recognized the doctrine contended for by counsel for the plaintiff in this case.

And in the case of Depue v. Flateau, 111 N. W. l. c. 2, the Supreme Court of Minnesota, in discussing this question, said:

"The facts of this case bring it within the more comprehensive principle that whenever a person is placed in such a position with regard to another that it is obvious that, if he does not use due care in his own conduct, he will cause injury to that person, the duty at once arises to exercise care commensurate with the situation in which he thus finds himself, and with which he is confronted, to avoid such danger; and a negligent failure to perform the duty renders him liable for the consequences of his neglect. This principle applies to varied situations arising from non-contract relations. It protects the trespasser from wanton or wilful injury. It extends to the licensee, and requires the exercise of reasonable care to avoid an unnecessary injury to him. It imposes upon the owner of premises, which he expressly or impliedly invites persons to visit, whether for the transaction of business or otherwise, the obligation to keep the same in reasonably safe condition for use, though it does not embrace those sentimental or social duties often prompting human action. [21 Am. & Eng. Ency. Law, 471; Barrows on Negligence, 4.] Those entering the premises of another by invitation are entitled to a higher degree of care than those who are present by mere sufferance. [Barrows on Negligence, 304.] The rule stated is supported by a long list of authorities, both in England and this country, and is expressed in the familiar maxim, 'Sic utere tuo,' etc. They will be found collected in the works above cited, and also in 2 Thompson on Negligence, 1702. It is thus stated in Heaven v. Pender, L. R. 11 Q. B. D. l. c. 509: 'The proposition which these recognized cases suggest, and which is, therefore, to be deduced from them, is that, whenever

one person is by circumstances placed in such a position with regard to another that every one of ordinary sense who did think would at once recognize that if he did not use ordinary care and skill in his own conduct with regard to those circumstances he would cause danger of injury to the person or property of the other, a duty arises to use ordinary care and skill to avoid such danger.' It applies with greater strictness to conduct towards persons under disability, and imposes the obligation as a matter of law, not mere sentiment, at least to refrain from any affirmative action that might result in injury to them. A valuable note to Railway Co. v. Cappier, 69 L. R. A. 513, discusses at length the character of the duty and obligation of those coming into relation with sick and disabled persons, and numerous analogous cases are collected and analyzed.

"In the case at bar defendants were under no contract obligation to minister to plaintiff in his distress; but humanity demanded that they do so, if they understood and appreciated his condition. And, though those acts which humanity demands are not always legal obligations, the rule to which we have adverted applied to the relation existing between these parties on this occasion and protected plaintiff from acts at their hands that would expose him to personal harm. He was not a trespasser upon their premises, but on the contrary, was there by the express invitation of Flateau, Sr. He was taken suddenly ill while their guest, and the law, as well as humanity, required that he be not exposed in his helpless condition to the merciless elements. The case, in its substantial facts, is not unlike that of Railway Co. v. Marrs, 27 Ky. Law Rep. 388, 70 L. R. A. 291. In that case it appears that one Marrs was found asleep in the yards of the railway company in an intoxicated condition. The yard employees discovered him, aroused him from his stupor, and ordered him off the tracks. They knew that he was intoxicated, and that he had left a train

recently arrived at the station, and he appeared to them dazed and lost. About forty minutes later, while the yard employees were engaged in switching, they ran over him and killed him. He had again fallen asleep on one of the tracks. The court held the railway company liable; that, under the circumstances disclosed, it was the duty of the yard employees to see that Marrs was safely out of the yards, or, in default of that, to exercise ordinary care to avoid injuring him; and that it was reasonable to require them to anticipate his probable continued presence in the yards. The case at bar is much stronger, for here plaintiff was not intoxicated, nor a trespasser, but, on the contrary, was in defendants' house as their guest, and was there taken suddenly ill in their presence, and, if his physical condition was known and appreciated, they must have known that to compel him to leave their home unattended would expose him to serious danger.

"We understand from the record that the learned trial court held in harmony with the view of the law here expressed, but dismissed the action for the reason, as stated in the memorandum denying a new trial, that there was no evidence that either of the defendants knew, or in the exercise of ordinary care should have known, plaintiff's physical condition, or that allowing him to proceed on his journey would expose him to danger. Of course, to make the act of defendants a violation of their duty in the premises, it should appear that they knew and appreciated his serious condition. The evidence on this feature of the case is not so clear as might be desired, but a majority of the court are of the opinion that it is sufficient to charge both defendants with knowledge of plaintiff's condition—at least, that the question should have been submitted to the jury. Defendant Flateau, Sr., testified that he was in the room at all times while plaintiff was in the house and observed his demeanor, and, though he denied that plaintiff fell to the floor in a

faint or otherwise, yet the fact that plaintiff was seriously ill cannot be questioned.  Flateau, Jr., conducted him to his cutter, assisted him in, observed that he was incapable of holding the reins to guide his team, and for that reason threw them over his shoulders.  If defendants knew and appreciated his condition, their act in sending him out to make his way to Madelia the best he could was wrongful and rendered them liable in damages.  We do not wish to be understood as holding that defendants were under absolute duty to entertain plaintiff during the night.  Whether they could conveniently do so does not appear.  What they should or could have done in the premises can only be determined from a full view of the evidence disclosing their situation, and their facilities for communicating his condition to his friends, or near neighbors, if any there were.  All these facts will enable the jury to determine whether, within the rules of negligence applicable to the case, defendants neglected any duty they owed plaintiff.''

In the case of the Ohio & Mississippi Railroad Co. v. Early, 28 L. R. A. 546, 1. c. 551, the Supreme Court of Indiana said:

''We do not think this evidence is sufficient to support the verdict.  While a railroad company is under no legal obligation to furnish an employee, who may receive injuries while engaged in the service of the company, with medical or surgical assistance, yet where a day laborer or employee has, by unforeseen accident to him while engaged in the line of his duty as such employee, been rendered helpless, the dictates of humanity, duty, and fair dealing would seem to demand that it should furnish medical assistance.  Of course, this duty could not rest upon the master in ordinary cases, in the absence of a contract to do so, but should rest upon him only in extraordinary cases, where immediate medical or surgical assistance is imperatively required to save life or avoid further serious

bodily injury. This duty on the railroad company only arises out of strict necessity and urgent exigency, where immediate attention thereto is demanded in order to save life or prevent great injury. The duty arises with the emergency, and with it expires. [Terre Haute & I. R. R. v. McMurray, 98 Ind. 358, 49 Am. Rep. 752, and authorities there cited.]''

And in discussing the same question, the Supreme Court of Nebraska, in the case of Salter v. Nebraska Telephone Co., 79 Neb. 373, l. c. 376, used this language:

''It will be unnecessary, as we view the case, to pass upon all the errors assigned by the appellant. While the rule is not uniform there are many cases holding that, where a company is engaged in a business dangerous to its employees, in case of an accident of such serious character that the injured employee stands in need of immediate medical or surgical attendance, the conductor of a train, or the highest officer of the company present at the time, has, from the necessities of the case, authority to represent the company and to bind it by the employment of a surgeon for such immediate medical or surgical services and care as are required. In support of this rule the court in Terre Haute & I. R. R. Co. v. McMurray, 98 Ind. 358, 49 Am. Rep. 752, said: 'An employer does not stand to his servants as a stranger, he owes them a duty. The cases all agree that some duty is owing from the master to the servant, but no case that we have been able to find defines the limits of this duty. Granting the existence of this general duty, and no one will deny that such duty does exist, the inquiry is as to its character and extent. Suppose the axle of a car to break because of a defect, and a brakeman's leg to be mangled by the derailment consequent upon breaking of the axle, and that he is in imminent danger of bleeding to death unless surgical aid is summoned at once, and suppose the accident to occur at a

point where there is no station and when no officer superior to the conductor is present, would not the conductor have authority to call a surgeon? Is there not a duty to the mangled man that some one must discharge? And if there be such a duty, who owes it, the employer or a stranger? Humanity and justice unite in affirming that some one owes him this duty, since to assert the contrary is to affirm that upon no one rests the duty of calling aid that may save life. If we concede the existence of this general duty, then the further search is for the one who in justice owes the duty, and surely, where the question comes between the employer and a stranger, the just rule must be that it rests upon the former.'

"In Marquette & O. R. R. Co. v. Taft, 28 Mich. 289, the yard-master of the defendant company employed a physician to amputate a leg and bind up the wounds and bruises of an employee injured in the service of the company. The employment by the yard-master was afterwards ratified by the general superintendent. The company defended upon the ground that it was not shown that either the yard-master or the general superintendent acted within the scope of their authority in employing the surgeon. Judgment went in favor of the plaintiff in the trial court, and this judgment was affirmed by the Supreme Court, Justices GROOVES and CAMPBELL voting for a reversal, COOLEY and CHRISTIANCY voting for an affirmance. Judges COOLEY and CHRISTIANCY appeared to have based their decision more upon the ground of the ratification of the employment by the general superintendent, than upon the authority of the yard-master to make a contract binding the company in the first instance.

"In Toledo, St. L. & K. C. R. R. Co. v. Mylott, 6 Ind. App. 438, a brakeman on the appellant's road met with an accident by which his skull was crushed. The

conductor requested the appellee to board and care for the injured man in every way necessary, stating that the company would pay for the same. The conductor was the highest officer of the company then present. After discussing the right of a general officer to bind the company by such employment, the court proceeded to discuss the right of the conductor to do so. We quote from the opinion: 'It being established that the general officers of the company would have the power under such circumstances to bind the company for the necessary board, care, and attention furnished an employee injured while in the performance of his duty, it follows, under the authorities, that the conductor also has such authority under certain circumstances. That the conductor has no such general authority in ordinary cases is conceded, but it is clear that he has such authority in the case of an emergency where an accident occurs remote from the general offices, when he is the highest officer of the company present, and when immediate action is required in order to preserve and protect the life of the injured man. In the face of this emergency, requiring immediate action to preserve human life, the duty devolves upon the company to act, and the conductor stands in the place of the company, clothed with such powers as may be necessary to meet the exigencies of the occasion.' The Supreme Court of Indiana, so far as our examination of the authorities has extended, has gone further than any other in adopting the rule that a subordinate officer has authority to bind the company by the employment of physicians and surgeons in case of an emergency, and where no higher officer of the company is present at the time, and these decisions are all to the effect that such employment binds the company only for the first or emergency service. There are numerous cases from other States holding that, where such services are obtained, and where there is direct or inferential evidence of a ratification by some general

officer, then the company is bound for all services so rendered.

"In Toledo, W. & W. R. R. Co. v. Rodrigues, 47 Ill. 188, the station agent of the company employed the appellant to nurse and take care of one Johnson, an injured employee of the company. He wrote to the general superintendent, making a full statement of all that had been done. The fourth paragraph of the syllabus is in the following words: 'Where an employee of a railroad company has received injury, while in the discharge of his duty, and the station agent, in his capacity as such, assumes certain liabilities in his behalf, for nurse and medical attendance, and writes a letter to the general superintendent, stating the facts, it is presumed that the general superintendent received such notice, and in the absence of any instructions to the contrary, consented, on the part of the railroad company, to assume the liabilities of the station agent for all reasonable charges in this behalf.' Toledo, W. & W. R. R. Co. v. Prince, 50 Ill. 26; Indianapolis & St. L. R. Co. v. Morris, 67 Ill. 295, and Cairo & St. L. R. R. Co. v. Mahoney, 82 Ill. 73, are to the same effect, but, as will be seen, these are based on the ratification by a general officer of the company of employment made by one without general authority to do so. On the whole, we are inclined to adopt the rule that a general officer of the company has power to make such a contract as is here sued on without showing that he had special authority to do so, and, if an emergency demanding immediate action exists, then the highest officer then present, whether he be conductor of a train, the station agent of the company or the foreman in charge of a gang of workmen, may bind the company for such medical and surgical attendance as the exigencies of the case may immediately demand. We recognize that this rule is one required by an emergency rather than one based on any general legal principle, and that the authority of the officer with limited pow-

ers, can extend no further than the emergency de-
mands. As said in Holmes v. McAllister, 123 Mich.
493: 'Authority to act is implied from the necessity
of the case. . . . Neither the authorities nor rea-
son carry the rule beyond the emergency. Such em-
ployment does not make the employer liable for the
services rendered by the physician to the employee af-
ter the emergency has passed. If the physician de-
sires to hold the employer responsible for subsequent
services, he must make a special contract with him.'

"It is urged by appellee that the emergency in
this case continued during the time that Crumb was in
the hospital, and this was probably the theory upon
which the district court directed a verdict for the
plaintiffs for the full amount of their claim. Toledo,
St. L. & K. C. R. R. Co. v. Mylott, supra, and Wil-
liams v. Griffin Wheel Co., 84 Minn. 279, are cited in
support of this position. A careful reading of the
opinion in the Mylott case will disclose that the only
question considered by the court was the right of
the plaintiff to recover at all, and that the question
of the amount of the recovery was not involved. In
the concurring opinion of DAVIS, J., it is said: 'No
question is raised as to the extent or amount of the
recovery. The only question presented for our con-
sideration is whether appellee was entitled to recover
anything. The court does not hold that appellee was
entitled to recover for board of others, or for the con-
tinued care and nursing of the brakeman beyond the
emergency then existing.' We do not attempt to de-
fine what are primary or emergency services, and Wil-
liams v. Griffin Wheel Co., supra, does not assist us in
attempting to determine the question, as the facts of
that case are dissimilar from this case, so far as dis-
closed in the opinion, and apparently are not fully
stated. We believe, however, that emergency services,
unless expressly limited at the time of procuring them,
ought to extend to a sufficient time for the party em-

ployed to communicate with the company, and, if it declines to be further responsible, for notice to the proper poor, authorities, if the injured party is entitled to public care.

"For the reason that the law will not impose upon the defendant company the duty of caring for one of their injured employees except for emergency treatment, and for the reason that the court refused evidence going to show that the company expressly disclaimed liability for further treatment, we recommend a reversal of the judgment."

It will be observed that some of the cases reviewed go so far as to even hold that a trespasser may, under such facts and circumstances, recover for such negligence, but we will express no opinion regarding that matter, for the reason that Hunicke was unquestionably an employee of the defendant.

There are many other cases in this and other States, which pass upon various phases of this case; but we have been cited to no others that deal with all of the elements of this case. However, in my opinion those considered are sound upon principle and based upon reason and humanity, the essence of all law.

In my opinion there is no possibility of doubt but what the law is that, whenever one person employs another to perform dangerous work, and while performing that work he is so badly injured as to incapacitate him from caring for himself, then the duty of providing medical treatment for him is devolved upon the employer; and that duty, in my opinion, grows out of the fact that when we get down to the real facts in all such cases, there is an unexpressed humane and natural understanding existing between them to the effect that whenever any one in such a case is so injured that he cannot care for himself, then the employer will furnish him medical or surgical treatment as the case may be.

This is common knowledge. There is not an industrial institution in this country, great or small, where that practice is not being carried on to-day; and that has been the custom and usage among men from the dawn of civilization down to the present day, and will continue to be practiced in the future, just so long as the human heart beats in sympathy for the unfortunate, and desires to aid suffering humanity. The same principle underlies all other avocations of life. Even armies while engaged in actual warfare observe. and obey this rule when possible. The soldier who refuses to render surgical or medical aid to the victim of his own sword, is eschewed by all decent men; while upon the other hand, all who administer to the wants and necessities of the sick and wounded, are considered as God's noblemen and as princes among men. So universally true and deep-seated is this humane feeling among men, and so universally recognized and practiced among them, that it has become a world-wide rule of moral conduct among men, brothers, friends and foes; and it says to one and all, You must exercise all reasonable efforts and means at hand to alleviate the pain and suffering and save the lives and limbs of those who have been stricken in your presence. For the violation of this rule of moral conduct there is no penalty attached save the condemnation of God and the scorn of all good men and women.

But seeing the wisdom, goodness and justice of this moral law, the law of the land laid its strong hand upon it, the same as it did upon many other good and useful customs of England, and breathed into it a living rule of legal conduct among men. It says unto all who employ labor that, because of this universally practiced custom of men to furnish medical and surgical aid for those who are stricken in their presence, you must furnish the employee with such services when he is so badly injured that he is incapacitated from caring for himself.

This is but the application or extension of the common-law rule which requires the master to furnish his servant with a safe place in which to work, and safe instrumentalities with which to perform that labor.

That law grew out of the old customs and usages of the English people, of furnishing their servants with a safe place in which to work and safe instrumentalities with which to labor. So universally true was that custom that the law read into all contracts of labor an implied promise on the part of the master to furnish those safeguards to his servants. There is no statutory or written law upon the subject. It is simply what is called the unwritten or common law of England, which has been adopted by statutes in this and many other States of the Union.

So in like manner into the universal custom of employers furnishing his employees with medical aid when so badly injured that they could not care for themselves, the common law, as in the cases of the safety appliances before mentioned, breathed an implied agreement or duty on the part of the former to furnish the latter medical or surgical aid whenever he was so badly injured that he could not care for himself.

This law, like the one previously mentioned, has no statutory origin, but has ripened into a law from wise and humane usages and customs that are so old that the memory of man runneth not to the contrary, and will continue so long as the conduct of man is prompted and governed by love and humane sentiments.

As previously stated, I am firmly of the opinion that the petition stated a good cause of action against the defendant, and that the evidence was sufficient to make a case for the jury; and so believing, I think the action of the trial court in granting a new trial to the plaintiff for the first and second reasons assigned by counsel for defendant, was not erroneous, but proper.

II. Counsel for plaintiff contends that the evidence tended to show that the defendant
**Evidence of Improper Treatment.** was guilty of negligence in not properly treating Hunicke after it undertook to so do.

Counsel have neglected to call our attention to that evidence, and after a careful reading of the record, I have been unable to find any evidence tending to support that contention.

The defendant did not undertake to treat the plaintiff until he reached the hospital in St. Louis, where his leg was promptly amputated, and there is not a word of evidence tending to show that the operation was not done in a proper and skillful manner. This contention is untenable.

III. This brings us to the consideration of the grounds assigned by the trial court for
**Instructions.** granting a new trial, which read as follows:

"The instructions given for plaintiff and for the defendant are contradictory, and I think the sixth instruction for defendant is not the law. Motion for new trial sustained."

It is contended, and the trial court so held, that there was an irreconcilable conflict between instructions numbered four and six, given for the defendant.

By reading the fourth it will be observed that the court instructed the jury that, if after Hunicke was injured the defendant exercised ordinary care to secure for him medical and surgical aid, then the defendant had fully discharged its duty to the deceased, and that there could be no recovery in this case.

This instruction is in harmony with those given for the plaintiff, in that it assumed that the defendant owed Hunicke the duty to furnish him emergency treatment. That was a correct statement of the law. But when we read defendant's instruction numbered six

it is seen that it tells the jury that if they were unable to determine whether the deceased would have died from the injury received, even though proper medical assistance had been promptly furnished him, then they should find for the defendant.

The effect of this instruction was to tell the jury that the defendant owed the plaintiff no duty whatever, unless the jury could determine an impossibility, namely, that Hunicke would not have died had proper medical attention been given him. God alone knew that fact, and no man or jury could determine that which no one knows, and which the evidence could not possibly reveal.

The law is, that just as soon as an injury of this character occurs, it then becomes the duty of the master to furnish medical treatment, and if he neglects to use reasonable efforts to do so, and the evidence shows that in all reasonable probability that failure was the proximate cause of the death, then the defendant was liable. In other words, in such a case, the court should have instructed the jury for the plaintiff that, if they believed from the evidence that the negligence of the defendant in not furnishing medical treatment for the injured party was the direct and proximate cause of his death, notwithstanding the injury, then they should find for the plaintiff; but upon the other hand, the court should have instructed the jury for the defendant, that if they believed from the evidence that the injury Hunicke sustained was the direct or proximate cause of his death, then they should find for the defendant.

Such an instruction would have eliminated from the case all metaphysical speculations, and have submitted to the jury which of the two acts mentioned caused the death.

I am, therefore, clearly of the opinion that these two instructions are in conflict with each other; and that said instruction numbered six, for the same rea-

son, is in conflict with those given for the plaintiff, and should not have been given.

For the reasons stated, we are of the opinion that the action of the trial court in granting a new trial was correct; and that the judgment should be affirmed. It is so ordered. All concur.