St. Louis Southwestern Railway Company *v.* Webb.

Opinion delivered March 15, 1926.

1. Business Trust—Liability of Trustee for Torts.—A railway company, as the trustee in charge of a hospital and having the power to appoint and discharge the superintendent in control thereof, is liable for acts of negligence or other torts committed by the superintendent or the other employees of the hospital in matters relating to the hospital.

2. Hospital—Negligence in Failing to Operate.—Where an authorized agent of a railway hospital agreed in an emergency to take a patient to the hospital and operate, and the patient should have been operated on at once, but the managing officers of the hospital, after several hours' delay, refused to operate, and sent the patient to another hospital where an unsuccessful operation was performed, *held* that it was a question for the jury whether their refusal increased the patient's suffering and lessened his chance of recovery.

Appeal from Miller Circuit Court; *J. H. McCollum,* Judge; affirmed.

*J. R. Turney, T. J. Gaughan, J. T. Sifford, J. E. Gaughan* and *E. E. Godwin,* for appellant.

*W. H. Arnold Jr.* and *B. E. Carter,* for appellee.

SMITH, J. Mrs. Cora Webb brought two suits against the St. Louis Southwestern Railway Company to recover damages on account of the suffering and death of her son, Quinn Anderson. The first suit was brought as administratrix of the estate of the said Quinn Anderson, and the second was brought by Mrs. Webb as the next of kin of the deceased. The causes were consolidated and tried together. The deceased was eighteen years old at the time of his death, and lived with his mother, and contributed to her support all his earnings. The young man had been employed by the railway company under a written contract to carry the mail to and from the post-office to the railroad station in Garland City, where his mother lived. For this service he was paid the sum of $15 per month, payable on the first and fifteenth of each month. He became ill with an acute attack of appendicitis, and a local physician advised Mrs. Webb that an immediate operation was necessary. Mrs. Webb applied to the station agent of the company at Garland City for a pass for her son to the railway company's hospital at Texarkana. The agent communicated with the company's superintendent at Pine Bluff, and was advised by that official that the young man was not entitled to the service of the hospital. Mrs. Webb then had the local physician telephone to Dr. J. K. Smith at Texarkana, and an arrangement was made whereby Dr. Smith would see that an ambulance met the train and carried the patient to the Michael Meagher Hospital, and Dr. Smith agreed to operate on the patient as soon as he had been received at that hospital. Immediately upon the receipt of the message from the physician at Garland City, Dr. Smith made the necessary arrangements with the Michael Meagher Hospital, at Texarkana, for an ambulance to meet the train.

Mrs. Webb bought tickets for herself and for her son, who was placed in the baggage car, and she went into that car with him. On the way to Texarkana Mrs. Webb had a conversation with the baggage-man in which she raised the question of the right of her son to hospital service, and the baggage-man told her to see the railroad company's agent upon the arrival of the train in Texarkana. The ambulance met the train, which arrived at Texarkana shortly after 2 P. M., and the young man was placed in the ambulance, and Mrs. Webb told the driver to wait until she had first seen the station agent. It is perfectly clear, indeed, it is undisputed, that Mrs. Webb thought her son was entitled to admission to the company's hospital as an employee of the railroad company. She was a working woman, and the expense of an operation in a hospital was one which she was naturally quite anxious to save, especially as she thought her son was entitled to this service without charge because of his employment. Mrs. Webb told her story to a Mr. Harrington, the station agent at Texarkana, and this agent at once called the company's hospital, and the persons in charge were advised that there was a sick person at the depot who needed immediate attention, and about whose right of admission to the hospital there was some question. This agent also got in communication with the superintendent of the company at Pine Bluff, and was advised by that official, as the agent at Garland City had been, that the young man was not entitled to the hospital service as an employee. The agent advised Mrs. Webb of this decision, and she then directed the driver of the ambulance to take them to the Michael Meagher Hospital. Just as the ambulance left the depot it was met by an automobile in which a Dr. Pitts and a Mr. Neislar were driving. Mr. Neislar stopped the ambulance and inquired whether the occupant was the patient whose right to admission to the hospital was in question, and, upon receiving an affirmative reply, he had a conversation with Mrs. Webb. Neislar had not at that time been advised

that the young man was not entitled to admission to the company hospital, although Harrington had told Neislar there was a question about it.

It is quite apparent from Mrs. Webb's own version of the conversation which she then had with Neislar that she had not conceded the fact to be that her son was not entitled to the hospital service, but that, on the contrary, she evidently thought her son was being denied a right to which he was entitled. Finally, Neislar asked her, if it should be ascertained that her son was not entitled to this service, whether she would pay for it or not, and she answered that she would pay, and with this understanding the ambulance was directed to drive to the company hospital.

There is much testimony in regard to the control and operation of the company's hospital. The contract between the railroad company and its employees was offered in evidence, and it was shown that the railroad company operated the hospital under an agreement constituting it as a trustee. The employees of the railroad company, by a voluntary payment of a fixed sum each month, which, with their permission, was reserved by the company out of each pay check, were entitled, when ill, to admission into the hospital and treatment without additional charge.

The railroad company administered the money derived from the collection of this fund, and the president of the railroad company had the authority to employ and to discharge the superintendent of the hospital, and the superintendent ran the hospital and employed all the subordinates. The superintendent and all others drawing salaries were paid out of this hospital fund.

The trust agreement under which the railroad company operated the hospital provided that officials of the different labor organizations to which the company employees belonged should have the right to elect an inspector, who should reside in the hospital and be paid out of the hospital fund, and it was the duty of this

inspector to see that proper treatment was given the patients, and to make reports of the management to the various labor organizations. The inspector had no other duty or authority in the management of the hospital.

Neislar was the inspector who had been so selected, and it was he who met the ambulance with Dr. Pitts, an assistant surgeon employed at the company hospital, just as the patient was leaving the depot for the Michael Meagher Hospital. Mrs. Webb testified that Dr. Pitts and Neislar got out of the automobile in which they had driven to the depot and came to the ambulance and inquired of Mrs. Webb if the boy in the ambulance was the patient going to the hospital. There is an irreconcilable conflict in the testimony as to the conversation which then occurred. Mrs. Webb testified that she told Dr. Pitts and Neislar that she thought her son was entitled to admission to the company hospital as an employee, but that she was advised he would not be received as such, and that she was on the way with her son to the Michael Meagher Hospital. Dr. Pitts and Neislar testified that they knew nothing about the arrangement for Mrs. Webb to take her son to the Michael Meager Hospital until after the patient was carried to the company hospital, and they supposed Mrs. Webb was on the way with the patient to the company hospital. Neislar admitted asking Mrs. Webb if she would pay for the hospital service if her son was not entitled to admission as an employee, and she answered that she would. Mrs. Webb testified that Dr. Pitts was present during this conversation and could have heard it had he been listening, although he took no part in the conversation.

According to the testimony offered on behalf of the railroad company, no one connected with the hospital knew anything about Mrs. Webb's arrangement to take her son to the Michael Meagher Hospital until after he had been carried to the company hospital. Harrington, the station agent at Texarkana, admitted talking to the

persons in charge of the company hospital over the 'phone after talking with Mrs. Webb and hearing her contention, and he repeated to the person answering the 'phone from the hospital what Mrs. Webb had said, but there is nothing in his testimony to indicate or to support a finding that he advised the company hospital that Mrs. Webb had arranged to carry her son to another hospital. While the testimony of Mrs. Webb stands alone that Neislar and Dr. Pitts were advised of this arrangement, it must, of course, be considered, and was evidently accepted by the jury as true, and, if her testimony is given full credit, as the jury had the right to do, then the jury might have found the facts as follows: After insisting that her son was entitled to admission and treatment in the company hospital as an employee, she started with him in an ambulance to the Michael Meagher Hospital, where Dr. Smith was waiting to perform the operation; but that she was diverted from going to the Michael Meagher Hospital by Dr. Pitts and Neislar, upon the assurance from them that her son would be given attention at the company hospital, provided she would agree to pay the hospital bill if it were finally definitely determined that her son was not entitled to this service.

The patient was not carried to the Michael Meagher Hospital, but was driven to the company hospital, where he remained until after 5 p. m. When the patient arrived at the company hospital, Dr. Chase, the superintendent, being absent, Drs. Kittrell and Collin, who were operating surgeons on the staff of the company hospital, were telephoned for, and, upon their arrival, it was seen that an operation for appendicitis was imperative and was immediately required. These surgeons prepared to operate after making a blood test, and they testified that they would have done so but for the fact that Mrs. Webb stated, in the discussion which arose as to whether her son was entitled to service as a railroad employee, that she had brought her son to Texarkana to be operated on by Dr. Smith at the Michael Meagher Hospital.

Upon receiving this information, Drs. Kittrell and Collin testified that they declined to operate, and Dr. Kittrell called up Dr. Smith on the 'phone and advised him that they were about to "swipe" one of his patients through ignorance of the fact that he was Dr. Smith's patient. Dr. Smith told Drs. Kittrell and Collin to go ahead with the operation, but they declined to do so, and the patient was again placed in the ambulance and carried over streets which were not in good condition for a distance of a mile or more to the Michael Meagher Hospital, where he arrived about 6 P. M., and the operation was performed between 6:30 and 7 P. M.

Dr. Smith testified that he hesitated about performing the operation, for the reason that he thought it was too late to be successful, and that, when he did perform the operation, he found that the appendix had burst. He advised Mrs. Webb immediately after the operation that her son could not live, and the young man died the next morning.

It is very earnestly insisted on behalf of the company that neither Dr. Pitts nor Neislar had any authority to agree to receive the patient in the hospital, as he was not an employee. But there was testimony that Drs. Kittrell and Collin were authorized to act in the absence of Dr. Chase, and that Dr. Pitts was in charge when Drs. Chase, Kittrell and Collin were all absent, and the testimony of Mrs. Webb is sufficient to support the finding that Dr. Pitts and Neislar agreed to receive the young man as a pay patient. We think also that testimony is sufficient to support the finding that the refusal of Drs. Kittrell and Collin, whose authority, in the absence of Dr. Chase, is not questioned, to operate was based upon a question of professional ethics involved after discovering that the patient had been brought to Texarkana to be operated on by Dr. Smith.

It is conceded by counsel for Mrs. Webb that her son was not entitled to hospital service as an employee, but it is insisted that the representatives of the hospital assumed charge of the case under a contract whereby

Mrs. Webb agreed to pay for the attention to her son. That it was known that an immediate operation was required, and that the railroad company, as trustee of the hospital, became liable for the failure to give the patient the treatment which they had undertaken to give and which the patient's condition required.

The testimony shows that the train on which Mrs. Webb and her son came to Texarkana arrived in that city shortly after 2 P. M., and that he was not finally carried to the Michael Meagher Hospital until about 6 P. M. The testimony is sufficient to support a finding by the jury that every minute of delay should have been avoided, if possible, and that, if the operation had not been delayed, the patient's chances of recovery would have been much greater and his suffering much less.

Dr. Smith testified that he was waiting at the Michael Meagher Hospital ready to operate, and the jury might have found that a delay of about three hours in operating would have been avoided had the patient not been diverted to the company hospital by Dr. Pitts and Neislar, and that the patient's chances of recovery were greatly reduced by the delay and his sufferings much increased.

Mrs. Webb recovered judgments in both suits, and it is the insistence of the company for the reversal of the case that an instructed verdict should have been given in its favor under the undisputed evidence.

We think, however, that, when the testimony of Mrs. Webb, that she advised Dr. Pitts and Neislar that she was on the way to the Michael Meagher Hospital, is given its highest probative value, the jury was warranted in finding that the patient was taken in charge in an emergency, and that there was a failure to discharge the duty due the patient in view of this emergency.

It was, of course, necessary for some one at the hospital to be clothed with the discretion to determine who should be admitted to the company hospital, and we think the testimony shows that Dr. Pitts had this authority, in the absence of the doctors who were his superiors.    He

was the house doctor, and was supposed to be at the hospital when no one higher in authority was there.  The question of Dr. Pitts' authority was submitted to the jury, and the verdict returned reflects the fact that the jury found he had the authority; indeed, as we have said, there does not appear to be any question that Drs. Kittrell and Collin would have operated had they not been advised before operating that the patient belonged to Dr. Smith.

We think the jury was warranted in finding that the railroad company was in complete control of the hospital as trustee through the power conferred on it by the trust agreement of appointing and discharging the superintendent, who was completely in control, subject only to the right of Neislar to inspect and report to the labor unions any inattention to any of the members of the unions which had selected him for that purpose.

As trustee in charge of the hospital, the company was liable for any wrongful conduct in its management.

In Sears' Trust Estates as Business Companies (2d ed.), § 40, it is said: "That trustees are liable in their personal capacity for acts of negligence or other torts committed by themselves or their agents in matters relating to the trust seems not seriously disputed.  Generally the question is whether or not the estate he represents is also liable."

The appellant railroad company cites the cases of *Arkansas Midland R. Co.* v. *Pearson*, 98 Ark. 399; *St. L. I. M. & S. R. Co.* v. *Taylor*, 113 Ark. 445; and *Runyan* v. *Goodrum*, 147 Ark. 481, as exonerating it from any liability for any lack of skill or for any negligence on the part of the doctor in charge of the hospital.  But in response to this contention it is pointed out that it is not charged that these doctors were lacking in skill or that they were negligent in their capacity as surgeons.  The theory on which the case was tried in the court below is that the persons who were at the time in charge of the hospital took the patient in charge in a known emergency and agreed to furnish him the immediate treatment which he would have received at another hospital with-

out delay but for the fact that the company's hospital representatives so took him in charge, and that these persons, who were doctors, but who were also the managers of the hospital at the time, failed and refused to give the patient the treatment which his condition immediately required. In other words, the cause of action is not based upon any incompetency or mistake of the surgeons as such, who in fact gave the patient no treatment, but upon the breach of a duty which had been assumed by the hospital authorities.

The cause was submitted to the jury under instructions which submitted the questions: (a) Did appellant, through its duly authorized agents, agree, in an emergency, to take the patient to the hospital and operate? (b) Should he have been operated on at once? (c) Did appellant refuse this operation? (d) Did this refusal increase the patient's suffering and lessen his chances of recovery? The jury must have found all these issues in favor of the plaintiff before returning a verdict in her favor.

Upon the finding of these issues of fact in the plaintiff's favor, we think a case was made for the jury.

In the case of *Dyche* v. *Vicksburg, S. & P. R. Co.,* 30 Sou. Rep. 711, the decedent was run over by a caboose under circumstances for which the railroad company was not liable. The patient was taken in charge and placed on a transfer boat. The yardmaster of the railroad company testified that decedent was ferried back and forth two or three times before being landed, and the physician at the hospital where the patient was finally carried testified that the delay lessened the injured man's chances for life. Under these circumstances the Supreme Court of Mississippi held that the trial court erred in giving a peremptory instruction for the defendant railroad company.

The authorities having in charge the hospital, and who were necessarily acting as agent for the railroad company as trustee of the hospital, assumed charge of the patient in a known emergency, and it then became the

duty of the hospital authorities to administer the treatment which the emergency of the case required. The occasion was not one for hair-splitting ethical questions. According to Mrs. Webb's testimony, her son would have been operated on several hours earlier if he had not been diverted from the Michael Meagher Hospital, but, after taking the patient into custody, the managing officers of the company hospital denied him the treatment which his condition required.

There is a humanitarian doctrine involved here. The patient was carried to the hospital where the operation could have been performed. The theory of the plaintiff's case is not that there was any negligence in the treatment given the patient, but that there was a withholding of treatment which was never rendered, and nothing was done except to send the patient to another hospital, and this only after a delay of several hours. *Illinois Central R. Co.* v. *Engle,* 102 Miss. 878; *Black* v. *New York, N. H. R. Co.,* 193 Mass. 448; *Northern Central Ry. Co.* v. *State,* 96 Am. Dec. 545; *Hunicke* v. *Meramec Quarry Co.,* 262 Mo. 560, 189 S. W. 1167.

In the case of *Sparks* v. *Murray,* 120 Ark. 17, a landlord undertook to make certain repairs which he was under no obligation to make. This court held that, notwithstanding the landlord was under no obligation to make the repairs, yet, if he undertook to make them, and made them in such a careless and negligent manner as to injure the tenant, the tenant might recover damages.

That principle is applicable here. The railroad company was under no duty to the patient, yet the care and control of the patient was assumed, and, after assuming it, the hospital authorities failed and declined to discharge the obligation they had assumed, and this failure and refusal was made by physicians acting in their capacity as managers of the hospital.

Under these circumstances there was a question for the jury, and, as no error appears, the judgment of the court below is affirmed.

WOOD, J., dissents.